2004 OK CR 16

**Edward Bruce PRIMEAUX, Appellant**

v.

**The STATE of Oklahoma, Appellee.**

**No. D 2002–319.**

Court of Criminal Appeals of Oklahoma.

April 6, 2004.

James Bowen, Wayna Lynn Tyner, Perry Hudson, Indigent Defense System, Capital Trial Division, Sapulpa, OK, Attorneys for Defendant at trial.

Mark L. Gibson, District Attorney, R. Brian Surber, Assistant District Attorney, Pawhuska, OK, Attorneys for the State at trial.

Grechen Garner Mosley, James Bowen, Wayna Lynn Tyner, Indigent Defense System, Capital Trial Division, Sapulpa, OK, Attorneys for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Brant M. Elmore, Assistant Attorney General, Oklahoma City, OK, Attorneys for Appellee on appeal.

## OPINION

LILE, Vice Presiding Judge:

¶ 1 Appellant, Edward Bruce Primeaux, was charged with two counts of alternative theories of First Degree Murder (malice murder or felony murder) in violation of 21 O.S.Supp.1999, § 701.7(A) & (B), in Case No. CF–2000–396 in the District Court of Kay County, for the deaths of Warren Littlecook and Julia Bear who were killed on July 5, 2000, in Ponca City, Oklahoma.

¶ 2 The State filed a Bill of Particulars alleging five aggravating circumstances in the deaths of both Littlecook and Bear: (1) the defendant was previously convicted of a felony involving the use or threat of violence to the person; (2) the defendant knowingly created a great risk of death to more than one person; (3) the murders were especially heinous, atrocious or cruel; (4) the murders were committed to avoid lawful arrest or prosecution, and (5) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.Supp. 1999, § 701.12(1), (2), (4), (5), & (7).

¶ 3 A jury trial was held before the Honorable D.W. Boyd, District Judge, in February 2002. The jury found Primeaux guilty of both counts of First Degree Murder. After the sentencing stage, the jury found the existence of all of the aggravating circumstances in the murder of Bear, and all but the "murder to avoid arrest" aggravating circumstance in the murder of Littlecook. The jury recommended that Primeaux be put to death for both of the murders. On March 1, 2002, Judge Boyd formally sentenced Primeaux to death on both counts, in accordance with the jury verdict. Primeaux has perfected his appeal of the Judgment and Sentence in this case.

## I. FACTS

¶ 4 Warren Littlecook and Julia Bear lived together at 812 North Pine in Ponca City, Oklahoma. They were found stabbed to death on Thursday July 6, 2000. The evidence revealed that Littlecook was initially stabbed in the chest with a knife, which severed a major artery. Then, he was stabbed six times in the back. Littlecook died as a result of a loss of blood from the initial stab wound, which severed his pulmonary artery. He also had four post-mortem stab wounds in the stomach. He had defensive wounds on his left hand.

¶ 5 Julia Bear was stabbed forty-one times. She was sitting in a wheelchair when she was attacked. She was stabbed one time each in front of both shoulders. She was stabbed once in the upper left quadrant of her abdomen. She was stabbed eight times below the right breast area (three of these punctured the liver, causing internal bleeding). There were stab wounds to both hands. She was stabbed once in the right side of her back (one stab wound was to the chest cavity, which punctured the right lung and caused it to collapse). She was stabbed six times on the left side of her back (two of these entered the chest cavity and punctured the left lung and caused it to collapse). She was stabbed four times in her left upper arm. She was stabbed seven times in the left rear side of her neck. She was stabbed six times on the left front side of her neck and face (one of these severed the left external carotid artery). There were two superficial stab wounds on the right side of her chin. A vacuum cleaner cord was wrapped once around her neck, but there were no signs of strangulation. She died as a result of multiple stab wounds.

¶ 6 An empty envelope was discovered next to a recliner. This envelope had contained the proceeds from Littlecook's monthly checks, which he received at the first of each month. One person described the amount in the envelope as a "large wad." Only $280.00 was recovered in the house. This money was hidden in a dresser drawer.

¶ 7 Testimony about the events leading up to their deaths revealed that the couple had cashed checks totaling about $1,400.00 on July 1st. They paid out just over $600.00 for rent and bills on that first weekend in July.

Primeaux knew that the victims received checks on the first of the month.

¶ 8 Frank Kowalski delivered meals to Littlecook and Bear around noon on July 5. He didn't see Littlecook or Bear, but Littlecook said okay when Kowalski said, "here are your meals."

¶ 9 The morning of July 5th, Primeaux left his house with about $15.00 so he could get a new tire for his bike. He told several people that he didn't have much money. However, he did buy some quart bottles of beer that morning, after he couldn't find a tire. He joined friends who were also drinking beer. One of them saw him with a knife, carving on the picnic table. He then went to a bar where he got angry because his "friend" would not let him drink any more of the beer the friend purchased.

¶ 10 Later that evening, Primeaux arrived home and said that he stabbed a man and a woman. He said that he "tore a couple up real good." Primeaux and his family gathered his bloody clothes in a trash bag and took the bag to Kaw Lake where they attempted to burn the clothes. Primeaux gave a knife to Billy Roberson, his stepson, who threw the knife in the lake. They stopped at two stores on the way to the lake and bought beer, cigarettes and some gas to burn the clothes. Primeaux provided the money for these items. Later, partially burned tennis shoes and beer bottles were found at the lake where officers were told the clothes were burned.

¶ 11 One witness testified that Primeaux came by her convenience store that afternoon and bought some beer; although, he usually paid for the beer in exact change, this time he used a bloody twenty-dollar bill. She also testified that Primeaux bought a larger amount of beer than he usually bought (six quarts of Busch Beer at 3:30 p.m.) Primeaux returned twice more and bought nine more quarts of beer.

¶ 12 Primeaux testified that Randy Davis stabbed Littlecook because Littlecook refused to give him beer. Police questioned Randy Davis, he claimed to have knowledge of the crime, and he knew things about the crime scene, which proved to be true. However, his story did not match the way the murders were committed. He was initially charged conjointly with Primeaux, and bound over for trial, but charges against him were later dropped.

¶ 13 Primeaux raises twelve propositions of error in his appeal. These propositions will be addressed as they arose during the prosecution of this case.

## II. PRETRIAL ISSUES

### A.

■ ¶ 14 In proposition eight, Primeaux argues that the United States Supreme Court decision in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) requires that the aggravating circumstances be charged by Information or Indictment and that they be proven at preliminary hearing. In *Ring*, the United States Supreme Court held that a capital jury must make any factual finding bearing on capital punishment beyond a reasonable doubt. *Ring*, 122 S.Ct. at 2439–40.

¶ 15 Primeaux bases this argument on some of the reasoning found in *Ring* that refers to aggravating circumstances as the "functional equivalents" of elements of the offense. As such, Primeaux argues that the United States Constitution and the Oklahoma Constitution require that the aggravating circumstances be charged by Information or Indictment and that the aggravating circumstances be presented before an examining magistrate at preliminary hearing. Otherwise, the District Court does not have jurisdiction over the case.

¶ 16 The decision in *Ring* is not as broad as Primeaux argues. The appellant in *Ring* did not specifically raise a claim that the indictment was constitutionally infirm. *Ring*, 122 S.Ct. at 2437 n. 4. *Ring* does not change the procedure in Oklahoma. Notice of the aggravating circumstances was provided in the bill of particulars. This document gives notice that the State intends to seek the penalty of death. The aggravating circumstances were presented to the jury and the jury was required to find that the aggravating circumstances existed beyond a reasonable doubt. This is all that is required by

law. *Johnson v. State,* 1982 OK CR 37, ¶ 10, 665 P.2d 815, 819.

## B.

■ ¶ 17 In proposition five, Primeaux claims that the evidence presented at the preliminary hearing was insufficient to hold him over for trial for the two counts of First Degree Felony Murder. He does not contest the evidence supporting Malice Murder. He claims that there was no admissible evidence to show that Primeaux robbed or attempted to rob either Littlecook or Bear.

¶ 18 Primeaux's only attempt to preserve this issue for appeal was his general demurrer to the evidence at the end of the preliminary hearing. He made no formal motion to quash prior to entering a plea at the formal arraignment.

> We have previously held that waiver is effected by failure to file a motion to quash prior to entering a plea. Even had his assignment been properly preserved it would fail on its merit. There is sufficient evidence from which reasonable cause that a crime was committed and that appellant committed it could be found by the magistrate.

*Koonce v. State,* 1985 OK CR 26, ¶ 7, 696 P.2d 501, 504, *overruled on other grounds in Landtroop v. State,* 1988 OK CR 90, 753 P.2d 1371 [citations omitted]. Primeaux's main argument is that the trial court relied on statements made by Randy Davis, which were later ruled inadmissible at trial. At preliminary hearing, Davis and Primeaux were charged conjointly with these crimes. At trial, the evidence was that Primeaux acted alone.

¶ 19 Primeaux claims there was no evidence independent from Davis's statements, which were not offered against Primeaux at the preliminary hearing due to Confrontation Clause problems. To the contrary, during the preliminary hearing evidence was presented that the victims had $1300.00 before the murder and only $240.00 could be found after the killing. After the murders, Primeaux had more money than he usually carried. Primeaux admitted to his family that he stabbed the victims. Primeaux and mem-

bers of his family went to Kaw Lake to dispose of his bloody clothes. A knife was thrown into the lake. During this hearing, Primeaux, waiving confrontation clause violations, introduced a statement made by Davis stating that Primeaux took money from an envelope in the victim's home.

¶ 20 The burden of proof at preliminary hearing is probable cause. 22 O.S.Supp.1999, § 258. The State presented sufficient evidence at preliminary hearing to establish probable cause that Primeaux committed the crime of Felony Murder, with Robbery with a Dangerous Weapon as the underlying felony, as well as Malice Murder.

## III. JURY SELECTION ISSUES

■ ¶ 21 In proposition one, Primeaux complains that the trial court improperly excused Juror Reeves for cause. We begin with the basic premise that the decision to excuse a prospective juror for cause rests within the sound discretion of the trial judge, whose decision will not be overturned unless an abuse of discretion is shown. *Myers v. State,* 2000 OK CR 25, ¶ 6, 17 P.3d 1021, 1026, *cert. denied,* 534 U.S. 900, 122 S.Ct. 228, 151 L.Ed.2d 163 (2001). This Court will review the prospective juror's entire voir dire examination to determine if the trial court made the proper discretionary decision. *Id.* A prospective juror must be willing to consider all the penalties provided by law, and the juror must not be irrevocably committed to any one punishment before trial has begun. *Myers,* 2000 OK CR 25, ¶ 6, 17 P.3d at 1026–1027.

¶ 22 The trial court first asked potential juror Reeves, "[C]ould you consider all three of the available punishments and impose that one punishment that you believe is warranted by the law and the evidence in this case?" She stated "No, Sir." The trial court then asked, "Which of those punishments could not consider?" She stated, "Death."

¶ 23 The trial court went on in an attempt to clarify Reeves' position by asking, "Are you saying that there are no facts or circumstances that you can conceive of where the imposition of the death penalty would be an

appropriate punishment?" Reeves replied that it would bother her.

¶ 24 The trial court explained to Reeves that the law requires that she consider all three punishments and impose the one that she believes is warranted under the facts and circumstances. The trial court asked her if she could set her feelings aside "and at least seriously consider the death penalty under the facts and circumstances once you know them?" She stated, "I am not sure I could." The proceedings were then moved to the trial court's chambers where Reeves could be questioned *in camera.*

¶ 25 The trial court asked her if her opposition to the death penalty would prevent or substantially impair her with finding the defendant guilty in the first stage. She stated that she was afraid that would be on her mind for a long time and she didn't know if she could.

¶ 26 The trial court then asked her, if the case were to reach the penalty phase, if she would automatically vote against the death penalty. She stated that it would be very hard for her to make that decision. The trial court told her that it would be hard for any juror and that feeling was different from someone who could not consider one of the penalty options. The trial court asked Reeves if there was any circumstance for which she believed the death penalty would be an appropriate punishment. She stated, "I don't know. I think I would still have a problem with it."

¶ 27 Primeaux's counsel was allowed to question Reeves. Counsel asked Reeves if she had a personal belief against the death penalty or if she just didn't want to be put in the position to decide. Reeves stated that she didn't want to be put in that position.

¶ 28 The trial court then continued questioning her and she stated that she didn't think the death penalty was wrong, but she didn't feel comfortable imposing it. The trial court then asked if her feelings would "prevent you or substantially impair you from considering the death penalty?" Reeves stated, "Yes." The Court: "regardless of what the facts and circumstances are ... ?" Reeves: "I think so."

¶ 29 We have held:

[N]ot all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.

*Allen v. State,* 1994 OK CR 13, ¶ 23, 871 P.2d 79, 90–91, *cert. denied,* 513 U.S. 952, 115 S.Ct. 370, 130 L.Ed.2d 322 (1994) (citations omitted). Reeves stated that she would have a hard time considering the death penalty and finally stated that her feeling would prevent her from considering the death penalty. She never stated clearly that she would set aside her feelings and consider all three punishment options.

¶ 30 We find that the manner in which the trial court conducted voir dire in this case complied with the law. *Matthews v. State,* 2002 OK CR 16, ¶ 16, 45 P.3d 907, 915, *cert. denied,* 537 U.S. 1074, 123 S.Ct. 665, 154 L.Ed.2d 570 (2002); *Abshier v. State,* 2001 OK CR 13, ¶¶ 113–14, 28 P.3d 579, 603–04, *cert. denied,* 535 U.S. 991, 122 S.Ct. 1548, 152 L.Ed.2d 472 (2002). The trial court was in the best position to determine Reeves' fitness for jury duty in this case by viewing Reeves' demeanor during questioning. *See Patton v. State,* 1998 OK CR 66, ¶ 16, 973 P.2d 270, 281–82, *cert. denied,* 528 U.S. 939, 120 S.Ct. 347, 145 L.Ed.2d 271 (1999). Based on the entire voir dire of this juror, we cannot say that the trial court abused its discretion in removing potential juror Reeves for cause.

## IV. FIRST STAGE ISSUES

### A.

¶ 31 One time codefendant Randy Davis made several statements to police. His statements were not allowed to be introduced during trial. In Proposition three, Primeaux claims that the trial court's ruling excluding statements made by Randy Davis was in error, because the statements were not offered for the truth of the matter asserted. Primeaux intended to subpoena Randy

Davis, however, the record indicates that Davis would invoke his Fifth Amendment right not to incriminate himself. Therefore, his unavailability was established.

¶ 32 Primeaux intended to call Detective Bohon during his case in chief. He made a record indicating that his testimony would be consistent with his testimony at the preliminary hearing. Primeaux also made an offer of proof for the testimony of Oklahoma State Bureau of Investigation Agent Willie Thornton by stating that his testimony would be essentially the same as Bohon's preliminary hearing testimony. Primeaux wished only to admit the statements that incriminated Davis and not the statement in which Davis incriminated Primeaux.

¶ 33 In pretrial hearings, the trial court ruled that none of Davis's statements would be allowed, "for the truth of the matter asserted." Primeaux had indicated in its response to a motion in limine by the State, that the statements were not offered for the truth of the matter asserted, thus not hearsay. However, the trial court ruled that the statements were hearsay.

¶ 34 At trial there was much argument about the statements being against Davis's penal interest. Title 12 O.S.2001, § 2804(B)(3), states, in part, that,

a statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

¶ 35 The trial court ruled that the statements were untrustworthy. The trial court stated, "the statements that Randy Davis made, either to his father or to law enforcement officials, whomever, are hearsay, and the only grounds under which this court has been advised that they might be admissible would be the exception to the hearsay rule contained in 2804(B)(3) . . ." The court went on to say that it knew of no other corroborating circumstances which showed that the statements were trustworthy.

¶ 36 Primeaux does not attack that ruling, but claims that the statements should have been introduced because they were not intended to show the truth of the matter asserted (a ground argued by Primeaux before trial).

■ ¶ 37 An analysis of the admissibility of hearsay statements involves several issues. In the context of statements offered for the truth of the matter asserted, three issues must be evaluated:

(1) Does the evidence constitute the serial repetition of a statement?

(2) What is the statement offered to prove?

(3) Is the statement offered to prove the truth of the matter asserted?

Whinery, *Oklahoma Evidence*, § 27.02 (1994).

■ ¶ 38 If the purpose for which it is offered is not to establish any assertions made by the challenged evidence, it is not hearsay. *Chambers v. State*, 1982 OK CR 123, ¶ 16, 649 P.2d 795, 798, *overruled on other grounds in Richardson v. State*, 1992 OK CR 76, 841 P.2d 603. Conversely, if the purpose of offering the statement is to establish any assertion made by the challenged evidence, it is hearsay.

■ ¶ 39 Statements not offered for the truth of the matter asserted are generally admissible. *Chambers*, 649 P.2d at 798. The determination of whether statements "fall within or outside the scope of the definition of being offered 'to prove the truth of the matter asserted' is perhaps more difficult than the management of any other aspect of the hearsay rule . . . ." Whinery, *Oklahoma Evidence*, § 28.03 (1994).

¶ 40 Randy Davis admitted to detectives that he was present when Primeaux stabbed Mr. Littlecook and Ms. Bear. He also admitted that he stabbed Ms. Bear also, because Primeaux "told him to."

¶ 41 Davis stated that he removed Ms. Bear's underwear and tried to have sex with her, but he did not ejaculate. Ms. Bear was wearing no underwear when she was found.

¶ 42 Appellant argues:

Mr. Primeaux sought to introduce Mr. Davis' statements to these third parties to show his knowledge of the scene, why he

had been arrested, that he repeatedly changed is [sic] story, to prove that he had been present at the scene, to corroborate Mr. Primeaux's testimony, to rebut the State's claim that no evidence implicating Randy Davis existed, and for the fact that the statements had been made, but not for the truth of the statements.

Appellate counsel does not assert that the statements were true or trustworthy.

¶ 43 The difficulty lies in the ability to evaluate the credibility of the absent declarant. If the statement is offered for the truth of the matter asserted, credibility becomes an issue. If the statement is not offered for the truth of the matter asserted, credibility of the absent declarant is immaterial. Whinery, § 27.01.

¶ 44 There are generally four types of statements that typically fall into this group of non-hearsay statements. Whinery, § 28.04. Primeaux argues that these statements fall in one of these four types—Statements of knowledge. *See* Whinery § 28.06. Primeaux argues that the statements are introduced to show that Davis had knowledge of the crime scene, which would have been gained by actual presence at the time of the crime.

¶ 45 However, an analysis of the statements reveal that Primeaux's only reason for admitting these statements was to show that Randy Davis was involved in this crime or was present when it occurred and to show that Primeaux's testimony was true. This is the ultimate truth of the matter asserted. The truth asserted is that Davis was present when the crimes occurred. The statements are details about the crime—Davis is basically saying, he was there and this is what happened. Regardless of the truth or trustworthiness of his statements, the truth of the matter asserted is "I was there."

¶ 46 Because the statements go to the truth of the matter asserted, Davis's credibility becomes an issue. Davis's out of court statements cannot be tested by the adversarial process. Therefore, the statements are inadmissible under the hearsay rule, the trial court found them unreliable and Appellant does not assert that they were reliable.

¶ 47 Another reason for admission, Primeaux claims, is to show that Primeaux was not the only suspect in the case. Primeaux claims that, without this evidence, the jury was left with a false impression that he was the sole suspect in the case, and that there was no evidence that anyone else was involved.

¶ 48 To the contrary, as discussed in proposition four, Detective Steiber, during cross-examination testified that Randy Davis was arrested as a suspect in this case. Steiber testified that probable cause had to be established before Randy Davis was arrested. Primeaux established the fact that no warrant was obtained to arrest Davis, but that someone in law enforcement had probable cause to arrest him. Primeaux elicited testimony indicating that Davis made statements to the police. Testimony indicated that by the time of the last statement Davis was under arrest for the crime. Primeaux even established the fact that Randy Davis was charged with this crime.

¶ 49 Primeaux also claims that the exclusion of this evidence based on strict adherence to the rules of evidence deprived him of due process. Primeaux claims that the exclusion of this evidence deprived him of evidence essential to his defense.

[T]o determine whether a defendant was unconstitutionally denied his or her right to present relevant evidence, we must balance the importance of the evidence to the defense against the interests the state has in excluding the evidence.

*Richmond v. Embry,* 122 F.3d 866, 872 (10th Cir.1997), *cert. denied,* 522 U.S. 1122, 118 S.Ct. 1065, 140 L.Ed.2d 126 (1998).

To establish a violation of ... due process, a defendant must show a denial of fundamental fairness.... It is the materiality of the excluded evidence to the presentation of the defense that determines whether a petitioner has been deprived of a fundamentally fair trial. Evidence is material if its suppression might have affected the outcome. In other words, material evidence is that which is exculpatory—evidence that if admitted would create rea-

sonable doubt that did not exist without the evidence.

*Ellis v. Mullin,* 326 F.3d 1122, 1128 (10th Cir.2002), *cert. denied,* —— U.S. ——, 124 S.Ct. 430, 157 L.Ed.2d 331 (2003)(*quoting Richmond,* 122 F.3d at 872).

¶ 50 In *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973), the United States Supreme Court held that the exclusion of evidence which bears "persuasive assurances of trustworthiness" may not be excluded based on a mechanistic application of the rules of evidence when that evidence is critical to a defendant's case.

¶ 51 The Court in *Chambers* expressly stated that the ruling was based on the facts and circumstances of the *Chambers* case and the rule did nothing to diminish the ability of States to establish their own criminal rules and procedures. *Id.*

¶ 52 In *Chambers,* the appellant was not allowed to impeach his own witness (who had confessed to the crime and later recanted), nor was he allowed to call witness that would say that the witness confessed to them. Unlike *Chambers,* in this case, Primeaux did not call Davis as a witness because he was unavailable, so he attempted to introduce Davis's statements to police.

■ ¶ 53 The State has an interest in preventing wholly unreliable and possibly perjured evidence from being introduced at trial. *See Chambers,* 93 S.Ct. at 1048. Primeaux admits that Davis's statements bear no assurances of trustworthiness. The statements were made after detectives lead him down a golden path of leading questions and interrogation. Davis, as an incompetent individual, was willing to tell the police exactly what they placed in his mouth.[1] Davis's statements do not meet the "persuasive assurances of trustworthiness" standard that must be met in order to overcome evidentiary rules excluding such evidence.

¶ 54 Furthermore, there is no indication that Davis's statement would create a reasonable doubt where none existed before. Therefore, the trial court correctly concluded that the statements were inadmissible. Primeaux's due process rights were not violated by the trial court's ruling.

**B.**

■ ¶ 55 In a proposition relating to Randy Davis as a possible suspect in this crime, proposition four, Primeaux complains that the State introduced misleading testimony of Detective Steiber. The State asked Steiber if he knew of any piece of physical evidence or statements made to third parties that would tie Randy Davis to what happened to the victims. Steiber answered, "absolutely none." This answer came during redirect examination. Primeaux did not object to the testimony, nor did he re-cross-examine Steiber on this answer. Primeaux now claims that the testimony amounted to State sponsored perjury, which deprived him of constitutional rights. Because there was no contemporaneous objection at trial, we review for plain error only. *See Simpson v. State,* 1994 OK CR 40, ¶ 10, 876 P.2d 690, 694.

¶ 56 Steiber was the lead detective on this case. During cross-examination, Primeaux was able to elicit testimony that Randy Davis was arrested as a suspect in this case. He was able to elicit testimony that probable cause had to be established before Randy Davis was arrested. It was established that no warrant was obtained but that someone in law enforcement had probable cause to arrest him. Testimony was also elicited that Davis made statements to the police and by the time of the last statement he was under arrest for the crime. Testimony was elicited that Randy Davis was charged with this crime.

¶ 57 Taken in context the detective's answer may well have been correct. Davis made statements to the investigating police, but he made no statements to "third parties" when defined as parties not involved in a transaction (or interrogation). Moreover, Steiber, at the time of trial, may well have believed that Randy Davis's statements were not reliable or trustworthy, thus his opinion

---

1. Davis was found to be incompetent to stand trial and that he could not attain competency within a reasonable time if provided with a course of treatment, therapy or training.

that there was no credible evidence linking Davis to the crime. There was no plain error here.

### C.

¶ 58 The State read the preliminary hearing testimony of Billy Roberson to the jury at trial. Prior to this a hearing was held to determine if Billy Roberson was unavailable so that his preliminary hearing testimony could be used. In proposition six, Primeaux argues that the trial court's finding that Roberson was unavailable was error and that that the preliminary hearing transcript does not bear a "sufficient indicia of reliability to afford the trier of fact a satisfactory basis for evaluating the truth of the prior testimony."

> To introduce a witness's prior testimony, the State must prove both 1) the witness's actual unavailability despite good faith efforts and due diligence to secure the witness's presence, and 2) that the prior testimony bears sufficient indicia of reliability to allow its admission at trial. The record must contain testimony regarding the State's efforts to find a witness. LaFevers complains that the State's efforts here were not enough and claims the State was required to issue a material witness warrant and out-of-state subpoena to Madden's last known address. To the contrary, this Court has held those actions constitute due diligence but has not required them.

[footnotes and citations omitted] *LaFevers v. State*, 1995 OK CR 26, ¶ 27, 897 P.2d 292, 304–05, *cert. denied*, 516 U.S. 1095, 116 S.Ct. 820, 133 L.Ed.2d 763 (1996).

¶ 59 The record clearly indicates that Roberson was absent from trial. Primeaux attacks the State's "due diligence" in seeking his attendance. Roberson was charged as an accessory to this murder and he had a deal that required him to testify. The prosecutor's office last met with Roberson prior to a trial date in August 2001. (This trial started on February 7, 2002). Roberson had appeared at all of his required court dates, bond hearings and meetings.

¶ 60 Three weeks prior to this trial, the prosecutor's office contacted Roberson's attorney, but the attorney could not contact Roberson. A subpoena was issued for Roberson, but the members of the sheriff's office could not locate Roberson to serve the subpoena. Roberson had a meeting with the prosecutor scheduled three weeks prior to trial, but Roberson did not appear.

¶ 61 A detective with the Ponca City police department tried to locate Roberson by contacting Roberson's family members and people he knew that might have knowledge of his whereabouts. Investigators went to Tulsa and contacted several people with whom he had reportedly been living.

¶ 62 On January 29th, a material witness warrant was issued for Roberson. Roberson could not be located before trial. Based on the facts presented to the trial court, the court did not abuse its discretion in ruling that Roberson was unavailable.

¶ 63 Primeaux claims, because Roberson was the only person to testify that he threw a knife into the lake after the murder, that his preliminary hearing testimony does not bear a "sufficient indicia of reliability to afford the trier of fact a satisfactory basis for evaluating the truth of the prior testimony."

¶ 64 The United States Supreme Court has held that, under similar circumstances, when a defendant is provided an opportunity to cross examine the witness and avails himself of that opportunity at a prior hearing, the confrontation clause is satisfied and a transcript of the prior hearing is admissible. *Crawford v. Washington*, —— U.S. ——, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004). We have held that this procedure is proper. *See Howell v. State*, 1994 OK CR 62, ¶ 18, 882 P.2d 1086, 1091, *cert. denied*, 514 U.S. 1113, 115 S.Ct. 1968, 131 L.Ed.2d 858 (1995).

¶ 65 Roberson's "testimony was given under circumstances which closely approximated those of a typical trial. His testimony was made under oath and in a truth-inducing courtroom atmosphere." *Bernay v. State*, 1999 OK CR 37, ¶ 17, 989 P.2d 998, 1007, *cert. denied*, 531 U.S. 834, 121 S.Ct. 92, 148 L.Ed.2d 52 (2000). The trial court did not abuse its discretion in allowing the prelimi-

nary hearing testimony of Roberson to be read during the trial.

## IV. FIRST STAGE INSTRUCTIONS

¶ 66 Primeaux attacks the instructions given to the jury in regards to the elements of First Degree Felony Murder in proposition two. These instructions follow the Information filed in this case, which Primeaux also attacks, in this proposition.

¶ 67 Primeaux was charged with two counts of First–Degree Murder. Each count alleged alternative theories of First–Degree Murder. The Information regarding the "felony murder" allegations is as follows:

> On or about the 5th day of July, 2000, and in the county and stage aforesaid, the defendant EDWARD BRUCE PRIMEAUX, committed the crime of MURDER IN THE FIRST DEGREE, a felony, in violation of 21 O.S.Supp.1996 § 701.7(A) by knowingly, intentionally and unlawfully killing Warren Littlecook by means of repeatedly cutting, slashing, and stabbing him with a knife while EDWARD BRUCE PRIMEAUX was engaged in committing the crime of Robbery by Force, to wit: by robbing Warren Littlecook by wrongfully taking and carrying away money that belonged to and was in the possession of Warren Littlecook from his person or immediate presence, without his consent and against his will, by means of a knife that EDWARD BRUCE PRIMEAUX used against warren Littlecook to overcome his resistance and rob him of the money, contrary to the from and the statute in such cases made and provided and against the peace and dignity of the State of Oklahoma.

Primeaux made no objection to the Information at the district court level. Therefore, we review for plain error only. *Tilley v. State,* 1998 OK CR 43, ¶ 4, 963 P.2d 607, 610. The elements of Robbery with a Dangerous Weapon are:

1. wrongful
2. taking
3. carrying away
4. personal property
5. of another
6. from the person/(the immediate presence) of another
7. by force/fear
8. through use of a (dangerous weapon).

21 O.S.Supp.1999, § 801, See OUJI–CR (2d) 4–144. The elements of Robbery by Force contain the first seven elements outlined above but not the eighth element. 21 O.S. 1991, § 791, See OUJI–CR (2d) 4–141. (First Degree Robbery requires that there be immediate force or fear of immediate force).

¶ 68 In closely looking at the Information, it is clear that while it states Robbery by Force, the language contains all of the elements of Robbery with a Dangerous Weapon. The question to be addressed is whether the Information gives the defendant notice of the charges against him and apprises him of what he must defend against at trial. *Parker v. State,* 1996 OK CR 19, ¶ 24, 917 P.2d 980, 986, *cert. denied,* 519 U.S. 1096, 117 S.Ct. 777, 136 L.Ed.2d 721 (1997)

¶ 69 Primeaux argues, in his reply brief, that Robbery by Force (or fear) can be committed with the use of a knife so there is no clear indication that the State intended to charge Robbery with a Dangerous Weapon. However, from the very beginning of this case, it is clear that the State intended to charge Primeaux with first-degree murder, 21 O.S.Supp.1999, § 701.7, under alternative theories of malice murder and felony murder.

¶ 70 It is the use of a knife that makes the underlying crime robbery with a dangerous weapon. Even though the State may charge Robbery by Force, even if a knife is used, it is clear here that the State intended the underlying felony to be the enumerated felony of Robbery with a Dangerous Weapon. The Information recites the First–Degree murder statute. The First–Degree Murder statute clearly indicates that the underlying robbery must be robbery with a dangerous weapon (it has been unchanged for many years). Clearly, the Information is sufficient to give the defendant notice. Therefore, there is no plain error here.

¶ 71 The trial court followed the Information and instructed the jury that the

underlying felony was Robbery by Force, thereby omitting the required element of "through the use of a dangerous weapon." The elements of Robbery by Force were given, which contain all of the elements of Robbery with a Dangerous Weapon except for the dangerous weapon requirement.

 ¶ 72 Primeaux made no objections to the Instructions. Therefore, we must limit our review for plain error only. Plain error arises from those "errors affecting substantial rights although they were not brought to the attention of the court." *Jones v. State,* 1989 OK CR 7, ¶ 8, 772 P.2d 922, 925, *quoting* 12 O.S.1981, § 2104(D), *overruled on other grounds in Omalza v. State,* 1995 OK CR 80, 911 P.2d 286; *Simpson,* 1994 OK CR 40, ¶ 10, 876 P.2d at 694. Plain error has also "been defined as an error which goes to the foundation of the case, or which takes from a defendant a right essential to his defense." *Simpson,* 1994 OK CR 40, ¶ 23, 876 P.2d at 698.

¶ 73 We have found that this type of instructional error rises to the level of plain error because it deprives a defendant of a substantial right. *See Roberts v. State,* 2001 OK CR 14, ¶¶ 16–17, 29 P.3d 583, 588–89. In *Roberts,* the trial court added a seventh element to first-degree burglary of "by going through an unlocked door." This Court reasoned that the added element negated the defense of consent, as the defendant asserted that the victim had consented to the entry through an unlocked door. This Court reversed the case because the element was a contested element in the case. *Id.*

¶ 74 In other cases, this Court has found fundamental error (now known as plain error) and reversible error in the failure to instruct on an element or in the failure to properly define an element of the offense.[2] A close analysis of these cases reveals that the elements, which were left out or ill-defined, were contested at trial or formed the crux of the crime.

¶ 75 In other cases, mainly larceny cases where a specific value has to be reached

before a conviction can be had, this Court has held that misinstruction on the value element can be harmless. In *Johnson v. State,* 1986 OK CR 156, ¶ 6, 727 P.2d 965, 968, this Court held that an instruction stating that for grand larceny the value of the item taken must exceed twenty dollars when in fact the law at the time required a value exceeding fifty dollars was harmless error because the evidence clearly indicated that the value of the items taken were well over fifty dollars. *Johnson,* 727 P.2d at 967–68.

¶ 76 In *Wofford v. State,* 1982 OK CR 83, 646 P.2d 1300, this Court held that an instruction on intent which stated that "a person is presumed to intend the natural, probable and usual consequences of his act" was error but harmless. This Court in *Wofford* reasoned that the evidence of intent was established by overwhelming evidence. We find, in the present case, that the failure to include every element of the underlying felony amounted to plain error.

 ¶ 77 Even though we have found plain error in the instruction, plain error does not, *ipso facto,* require reversal. *Simpson,* 1994 OK CR 40, ¶ 12, 876 P.2d at 695. Only structural errors, i.e. defects that affect the framework within which the trial proceeds, rather than simply an error in the trial process itself, require reversal regardless of the effect on the outcome. *See Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

¶ 78 Structural errors have only been found in limited cases: a total deprivation of the right to counsel; the lack of an impartial trial judge; unlawful exclusion of grand jurors of defendant's race; denial of the right to self-representation; denial of the right to a public trial; and erroneous reasonable doubt instructions to a jury. *See Johnson v. United States,* 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).

¶ 79 Reversible error is limited by 20 O.S. 2001, 3001.1:

2. *See Slusher v. State,* 1991 OK CR 83, 814 P.2d 504, *Pierce v. State,* 1988 OK CR 294, 766 P.2d 365, *Hackett v. State,* 1988 OK CR 44, 751 P.2d 761, *Favro v. State,* 1988 OK CR 18, 749 P.2d 127, *Hunter v. State,* 1987 OK CR 165, 740 P.2d 1206, *Atterberry v. State,* 1986 OK CR 186, 731 P.2d 420, and *Maple v. State,* 1983 OK CR 52, 662 P.2d 315.

No judgment shall be set aside or new trial granted by any appellate court of this state in any case, civil or criminal, on the ground of misdirection of the jury or for error in any matter of pleading or procedure, unless it is the opinion of the reviewing court that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right.

¶ 80 What makes this issue so important is the fact that, while alternative theories of murder were charged, the jury verdict form does not specify under which theory the defendant was found guilty. The jury could have found him guilty of malice murder or felony murder (which Primeaux claims is infirm). Primeaux claims that the jury verdict reflects that he was convicted of either first-degree malice murder or second-degree felony murder because of the faulty first-degree felony murder instructions.

¶ 81 The United States Supreme Court has recently decided a case where an instruction was given which omitted an element of the offense. In *Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 1833, 144 L.Ed.2d 35 (1999), the Court held that an instruction that omits an element of an offense may be subject to the harmless error doctrine. *Neder* is a federal mail fraud, wire fraud, bank fraud and filing false tax returns case. One of the elements in each count is that false statements must be material. However, the trial court instructed the jury not to consider the materiality of any false statements.

■ ¶ 82 The inquiry is whether it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error. *Neder,* 527 U.S. at 15, 18, 119 S.Ct. at 1836–38.

■ ¶ 83 The Court started from the premise that "most constitutional errors can be harmless." *Id.* 527 U.S. at 9, 119 S.Ct. at 1833, *quoting Arizona v. Fulminante,* 499 U.S. 279, 306, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). "[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analy-

sis." *Id., quoting Rose v. Clark,* 478 U.S. 570, 579, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986).

¶ 84 The Supreme Court had decided an earlier case where the trial court made the determination of materiality in a perjury prosecution. *Johnson v. United States,* 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). In that case, the Court determined that, absent an objection at trial, they would review for plain error only. The Court determined that "the error did not warrant correction in light of the 'overwhelming and uncontroverted' evidence supporting materiality." *Johnson,* 520 U.S. at 470, 117 S.Ct. at 1544. *See Neder,* 527 U.S. at 9, 119 S.Ct at 1833–34.

¶ 85 The Court concluded that the *Johnson* decision countered "the argument that the omission of an element will always render a trial unfair." *Neder,* 119 S.Ct. at 1834. The Court found that:

Neder was tried before an impartial judge, under the correct standard of proof and with the assistance of counsel; a fairly selected, impartial jury was instructed to consider all of the evidence and argument in respect to Neder's defense against the tax charges. Of course, the court erroneously failed to charge the jury on the element of materiality, but that error did not render Neder's trial "fundamentally unfair," as that term is used in our cases.

*Id.* The Supreme Court stated that "[t]he evidence supporting materiality was so overwhelming, in fact, that Neder did not argue to the jury—and does not argue here—that his false statements of income could be found immaterial." *Id.* 119 S.Ct. at 1837.

¶ 86 Neder argued that "to rely on overwhelming record evidence of guilt that the jury did not actually consider, he contends would be to dispense with trial by jury and allow judges to direct a guilty verdict on an element of the offense." *Id.* at 1837–38.

¶ 87 The test was set forth in this manner: Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error? To set a barrier so high that it could never be surmounted would justify the very criti-

cism that spawned the harmless-error doctrine in the first place: 'Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it.' R. Traynor, The Riddle of Harmless Error 50 (1970)

*Id.* at 1838.

¶ 88 The jury in the present case had sufficient evidence to conclude that Primeaux committed the crime of malice murder or felony murder and the underlying crime of robbery with a dangerous weapon. The missing element of "with the use of a knife" was not contested in this case, and there was overwhelming evidence that a knife was used in this crime. Primeaux, although he testified that he did not do it, testified that he saw the person stabbing Julia Bear with a knife.

¶ 89 Because the evidence of the use of a knife was overwhelming and uncontested, we find that the failure to include, in the instructions, the element of "with the use of a knife" was harmless beyond a reasonable doubt. The fact that alternative theories were charged, and the jury was not required to indicate the theory upon which it based its decision does not change our decision. The evidence in this case supported both theories beyond a reasonable doubt.[3]

## V. SECOND STAGE ISSUES

### A.

¶ 90 Primeaux argues, in proposition seven, that the prosecutor's argument based on the uniform jury instructions defining mitigating evidence violated his constitutional rights. Initially, we note that Primeaux has waived all but review for plain error on this issue because he failed to object to the argument of the prosecutor. *See*

*Simpson,* 1994 OK CR 40, ¶ 10, 876 P.2d at 694.

¶ 91 The prosecutor asked to jury to review instruction number 11, which states in part "mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame." The prosecutor told the jury that none of the mitigating evidence "extenuate what he did, that to the slightest degree reduce his moral culpability or his blame." During the second closing, the prosecutor stated, "I simply suggest to you that that in no way mitigates what he has done and what justice calls for in this case."

¶ 92 The quoted portion of the instruction, OUJI CR–2d 4–78, has been upheld by this Court. *Williams v. State,* 2001 OK CR 9, ¶¶ 108–09, 22 P.3d 702–727, *cert. denied,* 534 U.S. 1092, 122 S.Ct. 836, 151 L.Ed.2d 716 (2002).

¶ 93 In *Frederick v. State,* 2001 OK CR 34, ¶ 162, 37 P.3d 908, 949, this Court held that "the prosecutor is entitled to argue that the mitigation factors did not 'in any way [reduce Appellant's] moral culpability or blame.'" In *Frederick,* we held that the comment did not rise to the level of plain error.

¶ 94 Primeaux argues that the instruction, combined with the argument narrows the United States Supreme Court's definition of mitigating evidence: any evidence that a sentencing body could reasonably find warrants a sentence less than death. *Citing, McKoy v. North Carolina,* 494 U.S. 433, 441, 110 S.Ct. 1227, 1232, 108 L.Ed.2d 369 (1990).

¶ 95 The trial court in this case gave all of the required instructions on mitigating evidence, including instructions that the jury was the sole determiner of mitigating factors and that even if the mitigating factors were outweighed by the aggravating circum-

---

3. *See Hain v. State,* 1993 OK CR 22, ¶ 42, 852 P.2d 744, 752:

This Court has long held that a conviction for murder may be affirmed where alternative theories are charged when the evidence supports either malice aforethought or felony murder. In *James v. State,* 637 P.2d 862, 865–66 (Okl. Cr.1981), we held that when the alternative charges were based on the factual basis of the crime, rather than the actual nature of the offense, a jury was not required to indicate which of the alternatives upon which the conviction was based. *See also Newsted v. State,* 720 P.2d 734, 737 (Okl.Cr.1986); *Plunkett v. State,* 719 P.2d 834, 841 (Okl.Cr.1986); *Phillips v. State,* 641 P.2d 556, 559 (Okl.Cr.1982). *See also Schad v. Arizona,* 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991).

stances, they could still impose a penalty less than death.

¶ 96 There is no plain error here. The argument did not cause the jury to impose a sentence not supported by the evidence.

## B.

■■■■ ¶ 97 In proposition ten Primeaux makes what amounts to a philosophical argument against the death penalty. In proposition eleven, Primeaux urges this Court to re-examine our holdings on several issues relating to the death penalty procedure previously approved by this court.[4] We find no reason to revisit these issues.

¶ 98 In proposition ten, Primeaux implies that he could actually be innocent, and the possibility exists that an innocent man may be executed. Primeaux also cites Oklahoma's rate of executions and death row population as evidence that something is wrong with the system. Primeaux also re-

4. Appellant urges this Court to re-examine its stance on several issues heretofore denied.

 A. Unconstitutionally vague aggravating circumstances.
 1. Continuing threat to society—this aggravating circumstance has been held not to be vague in *Frederick v. State*, 2001 OK CR 34, ¶ 173–74, n. 13, 37 P.3d 908, 951–51, n. 13
 2. Murder to avoid arrest—this argument was also rejected in *Frederick. Id.*
 3. Especially heinous, atrocious or cruel—argument rejected in *Lockett v. State*, 2002 OK CR 30, ¶ 40, 53 P.3d 418, 430.
 Appellant has not cited any intervening case law or new argument which would cause this court to change its stance on these issues.

 B. Failure to give instructions defining Life or Life without Parole.
 Appellant failed to preserve this issue at trial because he failed to request specific instructions on this issue.
 We have previously rejected this issue. *Frederick*, 37 P.3d at 951. Appellant has made no new argument justifying a change in our case law. There is no plain error here.

 C. The jury was not told what would happen in the event of a deadlock.
 Appellant failed to raise this issue at trial, thus we review for plain error only. We have consistently rejected this argument. *Hooks v. State*, 2001 OK CR 1, ¶ 30, 19 P.3d 294, 311, *cert. denied*, 534 U.S. 963, 122 S.Ct. 371, 151 L.Ed.2d 282 (2001).
 Appellant has filed affidavits from jurors in his Rule 3.11 motion. This affidavits state that the jurors felt that Appellant should have received life without parole, but they surrendered their convictions. They state that they would not have surrendered their convictions if they had known that the result would be the judge sentencing to life or life without parole.
 This is precisely why we have consistently held that this instruction should not be given; the instruction "invites the jury to avoid its difficult duty to pass sentence on the life of an accused." *Malone v. State*, 1994 OK CR 43, ¶ 16, 876 P.2d 707, 713.

 D. The jury was not told that the aggravating circumstances must clearly outweigh the mitigating circumstances.
 The trial court gave OUJI CR 2d 4–80 which states that the aggravating circumstances must outweigh the mitigating factors. Appellant made no objection to these instructions; therefore, he has waived all but plain error. There was no error here. We have consistently stated that the instruction is proper. *Frederick*, 37 P.3d at 951, n. 13.

 E. Victim impact evidence has no place in Oklahoma's sentencing scheme.
 This is the argument that victim impact evidence acts as a "superaggravator." This Court has consistently rejected this argument and Appellant cites no new authority which would cause this Court to revisit this issue. *See Murphy v. State*, 2002 OK CR 24, ¶ 47, 47 P.3d 876, 886, *cert. denied*, 538 U.S. 985, 123 S.Ct. 1795, 155 L.Ed.2d 678 (2003).

 F. Violation of Due Process and Sixth Amendment rights to a determination of sentence in capital cases.
 Appellant argues that juries in Oklahoma are not properly instructed regarding their duty to impose the death sentence. Appellant claims that without clear, concise instructions and definitions, the jury just makes "shots in the dark." Then on appeal, courts with proper knowledge of the law give deference to the jury determination. Appellant claims that this violates *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
 Appellant's argument is based his claims of deficient instructions defining aggravating circumstances and sentencing options.
 There is no specific argument here and this issue was not preserved at trial by the offering of specific instructions.
 The trial court gave the uniform instructions which this Court has approved. There is no error here.

 G. Eighth Amendment violation.
 Appellant claims here that Oklahoma's death penalty scheme does not narrowly limit the class of murders subject to the death penalty. This argument has been rejected numerous times. *See Frederick*, 2001 OK CR 34, 37 P.3d 908.

fers to "concerns about the execution of the innocent." However, Primeaux cannot cite concrete statistics that show that innocent people are being executed, but Primeaux cites several reasons why those statistics don't exist—one of which is the truth dies with the victim and the executed individual.

¶ 99 Primeaux has not shown that he is an innocent victim being sent to his death by this State. Numerous constitutional safeguards along the way protect Primeaux. Furthermore, our duly elected legislature has seen fit to utilize the penalty of death for murders containing aggravating circumstances. This Court could cite numerous philosophical reasons why the death penalty is an appropriate punishment in this case; however, we leave that argument to the legislature and the people of the State of Oklahoma. The proper constitutional safeguards been followed in the trial of Primeaux. The death penalty is the appropriate punishment in this case.

## VI. VICTIM IMPACT EVIDENCE

██ ¶ 100 In Proposition nine, Primeaux complains that the statements by Louise Roy and Sheree Counselor contained statements not related to evidence of victim impact.

¶ 101 Three victim impact statements were read to the jury. One of the statements was from Fannie Deere, victim Littlecook's sister, read by Ed Littlecook. There was no objection to this statement. Sheree Counselor read two other statements, one was from Louise Roy, victim Bear's sister and the other was from Sheree Counselor, Bear's daughter. Primeaux raised objections to the victim impact evidence just prior to the introduction of the statements citing his written motion.

¶ 102 Primeaux specifically objected to portions of Counselor's statement that was allowed to be read by the trial court. This statement was "I have had nightmares several times. I hear her voice in my head, 'help me, Sheree, they're hurting me.'"

¶ 103 Primeaux now complains about this language in Counselor's statement, as well as other portions of the statement. Primeaux also complains about all of Roy's statement except for the last paragraph.

¶ 104 We have previously held that victim impact evidence, which meets the narrowly defined definition, is relevant in a first-degree murder prosecution. *Cargle v. State,* 1995 OK CR 77, ¶ 75, 909 P.2d 806, 828, *cert. denied,* 519 U.S. 831, 117 S.Ct. 100, 136 L.Ed.2d 54 (1996). *Cargle* was decided after this State's legislature adopted "victim impact" statutes in response to the United States Supreme Court's decision in *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

> [V]ictim impact evidence should be restricted to those unique characteristics which define the individual who has died, the contemporaneous and prospective circumstances surrounding that death, and how those circumstances have financially, emotionally, psychologically, and physically impacted on members of the victim's immediate family.

*Cargle,* 1995 OK CR 77, ¶ 75, 909 P.2d at 828. First, we find that the statements by Counselor properly show the emotional and psychological impact on her due to the death of her mother. *See Le v. State,* 1997 OK CR 55, ¶ 39, 947 P.2d 535, 551, *cert. denied,* 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998). Therefore, the statement, which was objected to at trial, was properly admitted.

██ ¶ 105 Primeaux complains that the remaining statements deal with the life of Julia Bear and not the impact of the Bear's death. Primeaux made a general objection to the victim impact statements in a written motion stating that the statements were substantially more prejudicial than probative. The trial court recognized the written motion during the hearing on the motion and stated that further argument was not necessary. This was sufficient to preserve this issue.

¶ 106 Roy's statement is as follows:

> This is from my Aunt Louise Roy. My sister was disabled and wheelchair bound. There wasn't very much she could do. Her and her companion lived on a meager income and stayed home most of the time. Once in a great while she would go to bingo or attend the pow-wow.
>
> When she came to visit, we would all enjoy her company. All of the children loved

her. As sisters, we were always very close. She was younger than me, so I used to always watch over her when we were growing up. In adulthood, I moved to California and she later came to stay with me. My spouse was in the U.S. Navy and would leave on a nine-month tour overseas. Living in another state and far from home, I was unbearably lonesome. She would come and stay with me to keep me company and keep from me [sic] being so lonesome. I knew if I ever needed her company, she was always near. Even now, I cannot believe she is gone. I find it unbearable to think of all the hurt she had to go through.

She was a loving person. All of the grand-children in the family loved her. They cannot understand why she is gone. This is the ultimate hurt.

Her death has left a void in my life and now I am afraid for my life. I now cannot watch movies with any kind of violence in it. After my sister's death, I was devastated, and a lot of joy has gone from my life.

Bruce Primeaux should get the death penalty.

Respectfully, Louise Roy.

¶ 107 This statement was not substantially more prejudicial than probative. The statement gives a brief glimpse into the life of the victim and provides a picture "of those unique characteristics which define the individual who has died." *Cargle*. There was no error in the introduction of this statement.

¶ 108 The statement of Counselor goes into more detail about Bear's life. She states that Bear enjoyed reading and going to bingo and getting dressed up to go to bingo. They talked on the phone once a day and Bear liked to play cards. Bear was kind and gentle and was in a wheel chair the last years of her life. "She was my confidant, my best friend."

¶ 109 These details about Bear's life were also not substantially more prejudicial than probative. The statement was limited to the "unique characteristics which define the individual who has died." There is no error here.

## VII. CUMULATIVE ERROR

¶ 110 Primeaux urges us to consider his proposed errors in a cumulative fashion in proposition twelve, if we find that none of them individually necessitate reversal of his conviction and sentence. We have reviewed the case to determine the effect, if any, of Primeaux's alleged accumulation of error. We find, even viewed in a cumulative fashion, the errors we identified do not require relief. *Woods v. State*, 1984 OK CR 24, ¶ 10, 674 P.2d 1150, 1154.

## VIII. MANDATORY SENTENCE REVIEW.

¶ 111 Title 21 O.S.1991, § 701.13, requires this Court to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance." Sufficient evidence existed to support the finding of the statutory aggravating circumstances. After reviewing the entire record in this case, we find that the sentence of death was not imposed because of any arbitrary factor, passion, or prejudice. The facts of this case and the overwhelming evidence of the aggravating circumstances simply warranted the penalty of death.

¶ 112 We find no error warranting reversal of Primeaux's two convictions and sentences of death for two counts of first-degree murder, therefore, the Judgments and Sentences of the trial court are, hereby, **AFFIRMED.**

JOHNSON, P.J. and LUMPKIN, J.: concur.

STRUBHAR, J.: concurs in results.

CHAPEL, J.: dissents.

CHAPEL, Judge, Dissenting:

¶ 1 I dissent from today's opinion because I firmly believe that this Court should not uphold two death sentences in a case where so many errors were made at the trial level and where the jury was purposefully misled by the State about the involvement of another individual in the double homicide for which

Edward Bruce Primeaux was tried and convicted. If the State is going to continue to pursue capital convictions, if trial courts are going to continue to conduct capital trials, if the Oklahoma Indigent Defense System is going to continue to do appeals for cases in which it served as trial counsel, and if this Court is going to be asked to affirm these capital convictions and sentences, we all have to do a better job than was done in this case. Capital trials test the entire system. I conclude that the system failed its test in Primeaux's case.

¶ 2 Although it was clear to the parties involved that the State *intended* to charge Primeaux with two counts of first-degree felony murder, under 21 O.S.Supp.2000, § 701.7(B), as an alternative to the two counts of first-degree malice aforethought murder, the State never actually did so. Within each of the three informations filed in Primeaux's case, the State invoked "Robbery by Force" as the predicate felony for its first-degree felony murder charges.[1] The State now acknowledges that robbery by force cannot serve as the predicate felony for a first-

degree felony murder charge or conviction, since it is not one of the enumerated felonies under 21 O.S.Supp.2000, § 701.7(B).[2]

¶ 3 While robbery with a dangerous weapon is one of the enumerated felonies under § 701.7(B), making it an adequate basis for a first-degree felony murder charge, the State never charged Primeaux under this theory. The State's arguments that it did, effectively, charge Primeaux under a "robbery with a dangerous weapon" theory are inconsistent with the actual language of the informations filed in this case. Primeaux had actual notice that the State was seeking to convict him of two counts of first-degree murder, under either a "malice aforethought" or a felony murder theory, but the State did *not* adequately charge its felony murder theory.[3]

¶ 4 It is surprising enough that the charging error was ever made, and made repeatedly, since the list of predicate offenses for first-degree felony murder, under § 701.7(B), is reasonably short and quite specific.[4] It is more remarkable still that the error was not caught or corrected prior to trial, in a capital case. And even if this Court could overlook

---

1. The original information in Primeaux's case, which included a second page, was filed on July 11, 2000. It charged Primeaux with two counts of first-degree murder (Counts I and II), through joint action with Randy Davis, and one count of conspiring with Davis to commit a robbery by force or fear (Count III). An amended information, adding an additional offense to the second page, was filed on October 10, 2000. On January 22, 2001, a second amended information was filed, this time removing any reference to Randy Davis, as well as the conspiracy count.

2. Each of the three informations wrongly cites "21 O.S.Supp.1996, § 701.7(A)" as the first-degree felony murder statute, even though this provision applies only to "malice aforethought" murder. This error, though seemingly minor, further illustrates the State's lack of due care in the preparation of the basic charging documents in this capital case and further undermines the "clarity" that the Court's opinion divines in these charging documents. *See* Court Opinion, p. 906.

3. Although I agree with the Court's opinion that Primeaux had actual notice of the State's intention to charge him with first-degree felony murder—and he does not claim otherwise—the language of the final information is not as clear as the Court suggests. The second amended information does not, in fact, "contain[ ] all of the elements of Robbery with a Dangerous Weapon"

(Court Opinion, p. 906), simply because it contains all of the elements of robbery by force and notes that a knife was used. The "use of a dangerous weapon" *element* is missing, and the "use of a knife" *fact* that was alleged is not equivalent to this element.

While all real guns (and even some toys guns) probably qualify as "firearms" for the purpose of a "robbery with a dangerous weapon" offense, all knives do not necessarily qualify as "dangerous weapons" for the purpose of this crime. *See* 21 O.S.Supp.2000, § 801 (defining offense) *and* OUJI–CR 4–144 (jury instruction). In any "robbery with a dangerous weapon" case in which the weapon allegedly used was a knife, it is up to the jury to determine whether the particular knife used actually constituted a "dangerous weapon." Though there is no question that a knife can constitute a dangerous weapon, it is the use of a "dangerous weapon" that must be charged in the information and found by a jury for a proper conviction of this crime. The Court's opinion is inaccurate and promotes confusion when it repeatedly refers to the "use of a knife" as an "element" of the crime of robbery with a dangerous weapon. *See* Court Opinion, pp. 906, 909.

4. *See* 21 O.S.Supp.2000, § 701.7(B). In addition, the Court notes in its opinion that this provision "has been unchanged for many years." Court Opinion, p. 906.

this error—since there is no doubt that Primeaux knew that the State was seeking a capital murder conviction against him, based on both a malice aforethought theory and a felony murder theory—it is much harder to swallow the fact that the *jury* was wrongly instructed on what was required to actually convict Primeaux of capital felony murder.

¶ 5 Primeaux's jury was instructed that it could find him guilty on each of the two counts of first-degree murder if it found that he killed the victims while engaged in the commission of a "Robbery by Force," the elements of which were listed within the instruction. The offense of "robbery with a dangerous weapon" differs from the offense of "robbery by force or fear," because robbery with a dangerous weapon requires an additional element, namely, that the robbery be committed through the use of a firearm or "other dangerous weapon[ ]." [5] Because Primeaux's jury was not instructed that it had to find that a "dangerous weapon" was used, in order to convict him of first-degree murder, and because the jury was specifically instructed that it could convict Primeaux of first-degree murder under either the State's "malice aforethought" theory or its felony-murder "robbery by force" theory—and also instructed that jurors were not even required to agree on which theory applied—the State acknowledges (as it must) that it is possible that Primeaux's jury convicted him of two counts of first-degree felony murder without ever actually making a finding on each of the required elements for this offense. Hence it is beyond dispute that the general verdicts filed in this case are infirm.[6]

¶ 6 In fact, the robbery by force theory upon which the jury was instructed would only have allowed Primeaux to be lawfully convicted of *second-degree* murder, an offense for which the death penalty is not even an authorized punishment.[7] The State and this Court both acknowledge, as we must, that we do not know whether Primeaux's jury found him guilty based upon the State's malice aforethought theory, its felony murder theory, or both. What we do know for sure is that if the jury convicted Primeaux of these two murders based upon the felony murder theory upon which it was instructed, the jury convicted him of an offense for which the death penalty is not a legally available punishment . . . and then proceeded to sentence him to death.[8]

¶ 7 The record in this case indicates that the jury instructions were prepared by the trial court and that neither the State nor defense counsel questioned the felony murder instruction at trial. Hence the blame for instructing the defendant's jury, in a capital case, on a felony murder theory that does not permit a capital conviction, rests jointly on the shoulders of all three players who could have prevented this serious error: the State, defense counsel, and the trial court. Ultimately, however, it is up to the trial court to ensure that a jury is not wrongly instructed,

5. The crime of robbery with a dangerous weapon includes all the elements of robbery by force or fear, and then adds the element of use of a firearm or "other dangerous weapon". *Compare* 21 O.S.Supp.2000, § 801 (robbery with a dangerous weapon) *and* OUJI–CR 4–144 (jury instruction), *with* 21 O.S.1991, § 791 (robbery by force or fear) *and* OUJI–CR 4–142 (jury instruction).

6. *See Stromberg v. California*, 283 U.S. 359, 367–70, 51 S.Ct. 532, 75 L.Ed. 1117 (1931) (where one possible basis of general verdict is invalid, entire verdict must be overturned); *Zant v. Stephens*, 462 U.S. 862, 881, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (recognizing *Stromberg* "rule" that "a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient

ground"); *see also Tibbs v. State*, 1991 OK CR 115, 819 P.2d 1372, 1375–76 (recognizing and applying rule of *Stromberg* and *Zant* ).

7. *See* 21 O.S.1991, § 701.8(2) (defining second-degree felony murder); 21 O.S.Supp.2000, § 701.9(B) (establishing life sentence as maximum penalty for second-degree murder). Hence a punishment of life without parole, upon which Primeaux's jury was also instructed, is likewise unavailable for a conviction of felony murder under a robbery by force theory.

8. The Court's conclusion that the evidence presented at trial was sufficient to convict Primeaux of either malice aforethought murder or "robbery with a dangerous weapon" felony murder (which the jury was not instructed upon) is irrelevant, since Primeaux does not raise a sufficiency of the evidence claim. *See* Court Opinion, p. 909.

especially on such a critical issue.[9] And I agree with this Court's conclusion that defense counsel's failure to object to the wrongful instruction amounted to plain error, allowing for review by this Court.

¶ 8 I recognize that the United States Supreme Court has told us that we can potentially "fix" even such fundamental instructional errors on appeal, through a harmless error analysis.[10] Under the Supreme Court's decision in *Neder v. United States*, this Court is allowed to ask, "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?".[11] Primeaux's jury apparently did not find its guilt-phase determination to be a simple and easy one. The jury deliberated for nearly six hours before seeking an evening recess, and then returned to deliberate the next morning for another two and a half hours, before reaching a verdict on the two murder counts charged. In addition, the jury sent a series of notes to the trial court, asking to review various pieces of evidence in the case.[12]

¶ 9 The *Neder* Court noted that if an appellate court "cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless."[13] Although Primeaux certainly did contest his alleged possession of a knife while in the victims' home and his use of a knife against them—he denied both in his testimony—the issue of whether the knife or knives that were used to rob and kill Julia Bear and Warren Littlecook constituted "dangerous weapons," sufficient to support that element of the crime of robbery with a dangerous weapon, simply did not come up directly at trial, since this element was never mentioned or addressed in any way. Nevertheless, I do not doubt that the jury that held Primeaux responsible for the killing of Bear and Littlecook would likewise have concluded that their robbery/murder involved the use of a dangerous weapon.

¶ 10 Regardless, I find this kind of appellate "filling in" for omitted but essential jury

**9.** In *Atterberry v. State*, 1986 OK CR 186, 731 P.2d 420, 422, this Court recognized:

In a criminal prosecution, the trial court has the duty to correctly instruct on the salient features of the law raised by the evidence without a request by the defendant.... Whether requested or not, the trial judge should instruct the jury on the essential elements of the offense.... Misinstruction on an essential element is fundamental error because it involves a substantial violation of the appellant's constitutional and statutory rights.

*Id.* at 422 (all citations omitted). *See also Maple v. State*, 1983 OK CR 52, 662 P.2d 315, 317 ("[I]t has long been established that the trial judge should, without request, instruct the jury on the essential elements of the offense, and the instructions should give the law of the case, including a definition of the offense sufficient to inform the jury of the facts necessary to justify a verdict of guilty.") (citation omitted).

**10.** *See Neder v. United States*, 527 U.S. 1, 10, 15, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (holding that omission of element of a criminal offense, from jury instruction listing the required elements of that offense, is subject to harmless error review).

**11.** *Id.* at 18, 119 S.Ct. 1827; *see also id.* at 15, 119 S.Ct. 1827 (describing harmless error analysis as "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'") (quoting *Chap-*

*man v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).

**12.** In what appears to be its first inquiry, the jury asked for an "original manuscript" or the videotape of Primeaux's interview with Detective Stieber. A separate note asked for the testimony of Officer Stieber, Billie Roberson, Pam Jones, and Shawn Fiarris, and also sought a VCR and a TV to review the crime scene videotape that was admitted into evidence. The trial court responded to the two notes as follows: "I regret that I am unable to comply with your requests other than providing the VCR/TV."

The jurors later sent a third note, stating that they would like to review the testimony of Shawn Fiarris, Billie Roberson, Pam Jones, and Detective Stieber, and asking if the court could provide them with a transcript of their testimony or have it read back to them. The trial court responded that it did not have the ability to provide transcripts of witness testimony and that the court reporter was not authorized to read back testimony to the jury. The court concluded, "Please continue your deliberations using your notes and collective memory." (Although the record filed in this case contains copies of the jury's notes and the trial court's responses, the trial transcripts do not record any discussion of these inquiries with the parties in the case.)

**13.** 527 U.S. at 19, 119 S.Ct. 1827.

fact-finding to be a troubling dilution of a defendant's Sixth Amendment right to a jury determination of his guilt. To me, this constitutional right necessarily includes a jury finding, beyond a reasonable doubt, on each of the factual elements of the offense upon which the defendant is charged and convicted.[14] An appellate finding about what a jury would have done, if they had been properly instructed, is not the equivalent of an actual jury determination.[15] This new approach is also a disturbing departure from our own Court's jurisprudence, in which we have traditionally insisted that the *jury* make all of the required factual findings and reversed convictions where an element of the charged offense was omitted from a jury's instructions or improperly defined.[16]

14. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) ("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."); *Mullaney v. Wilbur*, 421 U.S. 684, 698–704, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975) (holding that due-process requirement that State must prove, beyond a reasonable doubt, every fact necessary to constitute crime charged cannot be undermined by State's attempt to shift burden of proof on presence of "heat of passion" to defendant); *Sullivan v. Louisiana*, 508 U.S. 275, 278, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) ("It is self-evident, we think, that the Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated. . . . In other words, the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt."); *United States v. Gaudin*, 515 U.S. 506, 522–23, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) ("The Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged."); *Apprendi v. New Jersey*, 530 U.S. 466, 476–77, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (Fourteenth Amendment right to due process and Sixth Amendment right to jury trial "[t]aken together, . . . indisputably entitle a criminal defendant to 'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' ") (quoting *Gaudin* ).

15. *Neder*, 527 U.S. at 27, 119 S.Ct. 1827 (Stevens, J., concurring in part) ("There is, nevertheless, a distinction of true importance between a harmless-error test that focuses on what the jury did decide, rather than on what appellate judges think the jury would have decided if given an opportunity to pass on an issue."); *see also id.* at 30, 119 S.Ct. 1827 (Scalia, J., dissenting) ("I believe that depriving a criminal defendant of the right to have the jury determine his guilt of the crime charged—which necessarily means his commission of *every element* of the crime charged—can never be harmless.") (emphasis in original); *id.* at 38, 119 S.Ct. 1827 ("Harmless-error review applies only when the jury *actually renders* a verdict—that is, when it has found the defendant guilty of all the elements of the crime.") (emphasis in original); *see also Sulli-*

*van*, 508 U.S. at 279–80, 113 S.Ct. 2078 ("[T]o hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee. . . . The Sixth Amendment requires more than appellate speculation about a hypothetical jury's action.") (citations omitted) (This analysis was criticized in *Neder*.).

16. In *Pierce v. State*, 1988 OK CR 294, 766 P.2d 365, this Court held that "[t]he failure of the trial court to instruct on an essential element of the offense charged is fundamental reversible error, as it constitutes a substantial violation of an accused's constitutional and statutory rights," even where the failure was not challenged at the trial level. *Id.* at 366 (citing *Atterberry* and *Maple* ). And even though it was "personally repugnant" to the Court to subject the rape victim in that case to a second trial, the Court found that it was "compelled" to do so, under the law. *Id.* at 367. *See also Favro v. State*, 1988 OK CR 18, 749 P.2d 127, 129–30 (reversing conviction and rejecting State request to apply harmless error analysis, where trial court failed to instruct on intent element of offense); *Hackett v. State*, 1988 OK CR 44, 751 P.2d 761, 763 (reversing conviction for failure to instruct on all elements of offense; no harmless error analysis); *Maple*, 662 P.2d at 317 (reversing conviction for failure to instruct on elements of offense; no harmless error analysis).

The actual opinions in these cases do not support this Court's attempt to distinguish them by asserting that the omitted or wrongly defined elements in these cases "were contested at trial or formed the crux of the crime." *See* Court Opinion, p. 907 n.2. In these prior cases, this Court simply refused to engage in any kind of harmless error analysis.

Furthermore, the cases relied upon within today's Court opinion (*see* Court Opinion, p. 907) involved instructional errors totally unlike those discussed above. *See Johnson v. State*, 1986 OK CR 156, 727 P.2d 965, 967–68 (jury wrongly instructed that value of stolen property must exceed $20, rather than $50, where value of property stolen exceeded $2500); *Wofford v. State*, 1982 OK CR 83, 646 P.2d 1300, 1302–03 (jury instructed that persons are presumed to intend natural consequences of their acts). In addition, these decisions pre-date most of the decisions cited above.

¶ 11 This new approach is particularly disturbing in a capital case, especially since the felony murder offense upon which Primeaux's jury may have based its decision would not even permit a death sentence. The Supreme Court has been increasingly emphatic that a State should not be allowed to increase the maximum penalty to which a defendant is exposed without requiring a jury finding, beyond a reasonable doubt, on the factual element(s) upon which the enhanced sentence is based.[17] Moreover, it should be noted that the Supreme Court's *Neder* decision did not involve a situation where the defendant was improperly *charged*, as well as having his jury improperly instructed.[18] This Court should not be fixing both the charges filed by the State and the verdicts rendered by the jury in an effort to save botched capital convictions.

¶ 12 And yet I recognize the strength of the evidence presented by the State in this case, in both stages of the trial. Therefore *if* the charging and instructional errors were the only serious errors committed in this case, I *might* be able to hold my nose and swallow my own misgivings about the U.S. Supreme Court's harmless error jurisprudence and vote to affirm Primeaux's convictions and sentences, in light of the totality of the evidence presented. Unfortunately, however, the charging and instructional errors were only the beginning, literally and figuratively.

¶ 13 The more troubling and insidious errors in this case grew out of the struggle at the trial level with how to handle evidence relating to Randy Davis and his role in this case and these crimes.[19] The original information filed in this case charged that Edward Brice Primeaux and Randy Wade Davis "acting mutually and conjointly" committed two counts of first-degree murder (Count I involving Warren Littlecook; Count II involving Julia Bear) and one count of conspiracy to commit robbery by force and fear (Count III). Davis was charged with these same crimes, and a joint preliminary hearing was held during November of 2000.

¶ 14 The State's first witness at the preliminary hearing was Lieutenant Bob Stieber, of the Ponca City Police Department. In addition to testifying about his initial response to the crime scene, Stieber testified about the evolution of the State's focus upon Primeaux and Davis as the individuals responsible for the killing of Bear and Littlecook. Stieber testified that Davis and Primeaux had been seen drinking at a Ponca City residence on July 5, 2000 (the day of the murders), and that they had left that residence together. Stieber testified that Davis was initially brought in to be interviewed as a possible witness.

¶ 15 Stieber further testified, however, that while he was observing an interview of Davis by Detective Donnie Bohon, of the Ponca City Police Department, and OSBI agent Willie Thornton, "Randy [Davis] admitted to them that he had been involved in the stabbing and the killing of Julia Bear" and that the clothing he had been wearing at the time was still at his residence.[20] Stieber

This Court has not previously relied upon the *Neder* decision (at least not in a published decision) to preserve a jury verdict in which the trial court failed to instruct on an essential element of an offense. In fact, *Ellis v. Ward*, 2000 OK CR 18, 13 P.3d 985, is the only published opinion in which this Court has cited *Neder*. The *Ellis* opinion does assert that "[w]e apply harmless error analysis to claims relating to misinstruction of the jury." *Id.* at 986. Yet *Ellis* involved an improper instruction on the insanity defense, not a failure to instruct on an element of an offense. *Id.* at 985. Hence today's decision marks yet a further extension of this Court's harmless-error jurisprudence, and in my opinion, a mistaken one.

17. *See, e.g., Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); *Ring v. Arizona*, 536 U.S. 584, 589, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) ("Capital defendants, no less than noncapital defendants, ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment.").

18. *See Neder*, 527 U.S. at 6, 119 S.Ct. 1827.

19. Primeaux's Propositions III and IV on appeal both involve the handling of this evidence.

20. Stieber testified that at that point he stopped watching the interview, in order to prepare a request for a warrant to search Davis' home.

testified that a subsequent search of Davis' home revealed the clothing described and also that "the knife that had been used by him, that he had taken back to the residence, was found in that residence."

¶ 16 Detective Bohon testified at the preliminary hearing that Randy Davis' father, "Red" Davis, informed him that Randy Davis had been in Red's home drinking with Primeaux on the day of the murders. Bohon further testified that after then learning (from Stieber) about information that Primeaux had gone to the home of Bear and Littlecook that same day with a "white guy," they brought Randy Davis to the Ponca City Police Department to be interviewed. Davis, unlike Primeaux and the victims, is Caucasian and not a Native American.

¶ 17 Bohon testified that on July 8, 2000, when he and OSBI Agent Thornton first interviewed him, Davis was not a suspect. They simply wanted to determine if he had gone with Primeaux to the home of the victims, or been with Primeaux at all on the day of the murders. Bohon testified that after Davis told them that he *had* gone with Primeaux to the victims' home that day, that he had waited out on the sidewalk, and that he had seen "a little bit of blood," they decided to end that interview, which was not being videotaped or recorded. At that point they placed Davis in a holding cell as a material witness. They later began a new interview, this time in the official police department interview room.[21]

¶ 18 Bohon testified that during this second interview, which was videotaped,[22] Davis stated that he had been drinking with Primeaux and others at Randy Jones' house during the morning of July 5, 2000.[23] Davis stated that when they ran out of beer, they got more beer, and when that beer was finished, around noon or 1:00 p.m. that day, he and Primeaux went to "check on" Littlecook and Bear, to get money to buy more beer.[24] Davis stated that he waited outside on the sidewalk while Primeaux knocked on the door and that Bear let Primeaux in. Davis indicated that the door was left partially open, that Primeaux was in the home for approximately thirty minutes, that he heard some arguing about money but did not see anything inside the home, and that when Primeaux came back out, he had some blood on his shoe, but no money. After this interview Davis was allowed to go home.

¶ 19 Bohon testified that two days later, on July 10, 2000, he brought Davis back for further questioning.[25] Davis added numerous details to his account during this second recorded interview. Davis noted that before they went to the home of Bear and Littlecook looking for money, Primeaux went to the Friendly Tavern to try to get money from someone there, but that this was unsuccessful.[26] Davis maintained that he heard people in the victims' home saying, "No, we don't have any money. We're not going to give you any money." He also heard the argument progress to screaming and someone screaming, "Don't do this." After the screaming stopped, Primeaux came out of the

21. Bohon testified that Davis was Mirandized at the beginning of this interview and that after his rights were explained to him, he agreed to talk to them.

22. According to the prosecutor's statements at preliminary hearing, there were five separate interviews of Davis that were videotaped, which lasted a total of seven to eight hours. Because none of these videotapes is included in the record before this Court, however, my summary of the various statements made during these interviews is based entirely on Detective Bohon's preliminary hearing testimony.

23. Davis indicated that he went to the home of Randy Jones and Sharon Nelson (who lived across the street from him) at 8:30 a.m., and that he, his father, Jones, Nelson, and "Uncle Shorty"

were all there drinking beer together, when Primeaux showed up with his two quarts of beer.

24. Davis noted that they knew from Lisa Williams that Bear and Littlecook (who Williams referred to as "grandma" and "grandpa") received their S.S.I. checks on the 3rd day of the month. Davis later indicated that he did not know the couple personally, though he knew Williams.

25. At the beginning of this second recorded interview, Davis was again Mirandized, and he again agreed to talk to Bohon and Thornton, who conducted all of the interviews with him.

26. Davis noted that he waited outside, because he had been barred from entering the Friendly.

house with blood on both legs, from about the knee area down.

¶ 20 Later, in that same interview, Davis indicated that he saw blood on the porch of the home, and (later still) that he saw the man come out onto the porch (without any blood on him) and then saw Primeaux come out and stab him in the chest. Davis stated that the man fell down, that Primeaux stabbed him some more, and that Primeaux then grabbed him by the feet and pulled him back into the house. Bohon testified that at that point they stopped the interview and asked Davis if he would be willing to take a polygraph test.[27]

¶ 21 Bohon testified that after the polygraph test, which was given by a different officer, they began a third recorded interview, around 2:30 p.m. that afternoon. Agent Thornton began by telling Davis that he "didn't do too well on the polygraph," and Davis responded, "Okay, I'm going to tell the truth now." During this interview Davis said he was up on the porch, rather than on the sidewalk, and then later admitted that he had gone into the home. Davis said that he was in the home while Primeaux was arguing with Bear and Littlecook about money, and that Primeaux took a brown envelope from between the arm and the cushion of a living room chair and got money out of it. Davis stated that when Littlecook got upset about this, Primeaux stabbed him. Davis stated that Littlecook fell down and was trying to crawl out the front door when Primeaux grabbed him, pulled him back in, and stabbed him several more times in the chest and upper body.

¶ 22 According to Davis, Primeaux then stabbed Bear, while she was sitting in her wheelchair, and that after she fell out of her wheelchair, he stabbed her several more times. Davis stated that Primeaux had "poked a hose through [Bear's] neck," which he described as coming off an oxygen bottle on the back of her wheelchair.[28] When asked about where Primeaux's knife had come from, Davis stated that his father (Red Davis) had been showing off the knife at Randy Jones' house and that when Davis left to go to the Friendly to meet up with Primeaux, he put his dad's knife in his pocket. Davis stated that Primeaux took this knife from him while they were in the victims' living room. Davis also stated that Primeaux gave him $50 from the money stolen from the home.

¶ 23 Bohon testified that during this same interview, Davis indicated that Primeaux had raped Julia Bear, which was the first time that a possible sexual assault had been mentioned in the case.[29] Just before the interview concluded, however, Agent Thornton confronted Davis, saying, "You raped her, didn't you?". After initially denying it, Davis admitted that he had "made love" to Bear. When asked when this had occurred, Davis stated that after Bear had been stabbed once in the belly and fallen out of her wheelchair, he had pulled off her panties and "made love to her," while Primeaux was stabbing Littlecook.[30] Davis stated that he penetrated Bear but was unable to ejaculate, and that Bear was still alive at this point. Bohon testified that the interview was then concluded, and that at 4:10 p.m. that day, Davis was booked in on a charge of first-degree murder.

¶ 24 Bohon testified that Davis was inter-

---

**27.** Bohon testified that Davis was no longer free to go, that they suspected he had received money from Primeaux, but that they still did not suspect Davis of involvement in the actual stabbings.

**28.** Bohon testified that they were very interested in this statement, because Bear had been found with a vacuum cleaner cord wrapped around her neck, and this fact had not been released to the public. Bohon testified that when they showed Davis a crime scene picture of Bear and asked him about this "hose," Davis indicated that the vacuum cord wrapped around Bear's neck was what he was talking about.

**29.** Bohon testified that Davis stated that Primeaux had "lifted Ms. Bear's dress up and played with her" and that Davis said he could see that Primeaux "was humping on her."

**30.** The medical examiner did not find any physical evidence that Bear was raped or sexually assaulted, though Bear was not wearing underwear when her body was discovered. Although Stieber testified at the preliminary hearing that "underwear" was found near the body of Bear, he "corrected" this testimony at trial, stating that it was a "silk slip," rather than underwear, that was found near her body.

viewed again at 6:36 p.m. that day.[31] This time Bohon and Thornton accused Davis of stabbing Bear and suggested that they suspected that due to the number of times she had been stabbed, there may have been "a sexual rage involved." Davis then admitted that he stabbed Bear after raping her.[32] Davis continued to maintain that it was Primeaux who initially stabbed Bear, but stated that after he (Davis) had sex with her, he got his knife back from Primeaux and stabbed Bear numerous times in her upper body, abdomen, and chest.[33] When asked if he also stabbed Bear in the neck area, Davis responded, "No, Bruce did that." When asked why he stabbed Bear, Davis indicated that Primeaux "told him to." Davis noted that Primeaux gave him $50, and that afterwards he bought two thirty-packs of beer and ten packs of Star cigarettes (at $1.83 per pack), and then went home.

¶ 25 Bohon testified that during this interview, Davis was asked numerous questions about the knife used in the killings. Although he once indicated that Primeaux had thrown it out in the yard, Davis later stated that he took the knife back home and gave it to his dad, and that his dad normally kept it on his dresser. A subsequent search of the Davis home recovered a knife from a dresser drawer. In a fifth recorded interview, on the morning of July 11, 2000, Davis confirmed that the knife found in his father's home was the knife to which he had been referring. At the conclusion of the preliminary hearing, the magistrate announced that he was binding both Primeaux and Davis over on the three original counts, and that he was also binding

Davis over on a fourth charge, namely, rape in the first degree.

¶ 26 Yet much had changed by the time of Primeaux's trial, in February of 2002. Although the record regarding what occurred and why it occurred in the case against Randy Davis is not entirely clear, statements made by both parties (during various hearings in Primeaux's case) indicate that the State dismissed all of its charges against Davis in October of 2001.[34]

¶ 27 The issue of how the Davis evidence could be used during Primeaux's trial was hotly contested and was addressed on numerous occasions, both before and during Primeaux's trial. Initially, the State filed a motion in limine seeking a ruling, "*pre-trial,* as to whether statements made by Davis will or will not be admissible in *any* part of [Primeaux's] trial," arguing that this ruling was necessary because this determination would affect the entire presentation of the State's case, as well as its trial strategy.[35] Primeaux responded by adding Detective Bohon and Agent Thornton to his witness list, noting that they would testify regarding their interviews with Davis.[36]

¶ 28 At a pre-trial hearing held on August 8, 2001, the issue of the admissibility of Davis' statements was addressed extensively. The State argued that if Primeaux wanted to introduce any portion of Davis' videotaped statements, the State would have to be allowed to introduce the five videotaped statements in their entirety. Primeaux's counsel responded that he did not intend to introduce the actual videotapes, but rather to question the interviewing officers about certain specif-

---

**31.** This fourth recorded interview (the third that day) began with Davis again being Mirandized.

**32.** In later hearings, Davis is quoted as saying, "Okay, I did it."

**33.** Davis stated that Bear was in front of the couch when he "made love to her" and that she crawled over toward the wall heater, where he stabbed her, while he was getting the knife.

**34.** The record in this case contains little precise information about what happened in Davis' case. There are numerous references to a competency determination during the fall of 2001, and Primeaux states in his brief that "the only reason the State dismissed charges against Randy Davis and changed their theory of the case was because

he was found incompetent to stand trial and unable to gain competency." And in a hearing on October 1, 2001, the prosecutor indicated that two doctors had found Davis to be incompetent and "seriously mentally retarded." Yet the prosecutor also indicated that the State had basically lost confidence in its evidence against Davis, and later stated that it dismissed the charges against him for this reason.

**35.** *See* 7/26/2001 Motion in Limine, O.R. 321 (emphasis in original).

**36.** *See* 7/31/2001 Defendant's Second Supplemental Witness List, O.R. 332–36.

ic statements made by Davis.[37] When the State objected that this testimony would be inadmissible hearsay as to Primeaux, defense counsel argued that Davis' statements were admissible under the § 2804(B)(3) exception to the hearsay rule, because Davis was unavailable and the statements were against his penal interest.[38] The State responded by arguing that these statements were still inadmissible, because they did not meet the standard of trustworthiness established in § 2804(B)(3).

¶ 29 At the end of the hearing, the court ruled that although certain of Davis' statements were definitely against his penal interest, the court needed to view all of the videotapes in order to determine if Davis' statements were trustworthy, and whether Davis actually believed the statements to be true at the time he was making them. The court asked defense counsel to determine which of Davis' statements would be offered and set a future hearing on the issue.[39]

¶ 30 Shortly thereafter, on August 17, 2001, Primeaux filed a response to the State's motion in limine. In this filing Primeaux referenced the five videotaped interviews of Davis and asserted that "all of the individual statements Davis makes during the course of the interrogation process are admissible" and indicated that he intended to introduce this evidence "in its entirety" at trial. Primeaux then argued that the "vast majority of the statements made by Davis do not constitute

hearsay because they are not being offered for the truth of the matter asserted." Primeaux cited numerous decisions from our Court discussing the nature of the hearsay rule and noted that "[i]f a statement is not offered to prove the truth of the matter asserted then it is not hearsay."

¶ 31 Primeaux argued that the vast majority of Davis' statements were not hearsay, because they were being offered for purposes other than to show that the specific statements were true, e.g., to show that the statements were, in fact, made by Davis, within a conversation with police officers, and to show how Davis changed his story multiple times, in a way that increasingly acknowledged his own culpability and participation and increasingly lessened the participation and culpability of Primeaux.[40] Primeaux then argued that if the court concluded that Davis' actual admissions that he raped and stabbed Julia Bear were hearsay, offered to prove the truth of the matter asserted therein, these statements were still admissible under the § 2804(B)(3) exception to the hearsay rule, as statements against penal interest.

¶ 32 At the subsequent pre-trial hearing on October 1, 2001, the trial court informed the parties that it had viewed the Davis videotapes in their entirety. The court summarized the issue before the court as being whether the statements Davis made to the interviewing officers were admissible under the § 2804(B)(3) exception to the hearsay

**37.** The trial court commented that this would seem to waive Primeaux's protection against the admission of statements by a co-conspirator, and Primeaux's counsel agreed and conceded that if Primeaux decided to question the officers about Davis' statements, the State could respond by bringing out additional statements made by Davis and even playing the actual videotapes.

**38.** The "against penal interest" exception to the hearsay rule allows for the admission at trial of the out-of-court statements of a non-testifying individual (the declarant), for the purpose of establishing the truth of the matter asserted by the declarant therein, provided that the declarant is "unavailable" to testify at trial, and the statement satisfies the following criteria:

A statement which was at the time of its making contrary to the declarant's pecuniary or proprietary interest, or which tended to subject him to civil or criminal liability, ... and which a reasonable man in his position would not

have made unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

12 O.S.1991, § 2804(B)(3). The State conceded during this and subsequent hearings that Davis was "unavailable" as a witness; and there was never any real debate that a *reasonable* man in Davis' position would not have made the incriminatory statements that Davis made if he did not believe these statements to be true, since such statements obviously did tend to subject him to criminal liability.

**39.** The court noted that it would view the videotapes and research the § 2804(B)(3) exception to the hearsay rule before the hearing.

**40.** Primeaux's arguments in this filing largely track his arguments on appeal in Proposition III.

rule, and laid out the requirements for admissibility under this hearsay exception. The State then argued, at *length,* that Davis' inculpatory statements could not be admitted under this exception, because the surrounding circumstances did not indicate their trustworthiness or corroborate Davis' statements.[41]

¶ 33 Primeaux's counsel countered by referencing the response that he had filed to the State's motion in limine and arguing that the "vast majority" of the statements made by Davis were not being offered for the truth of the matter asserted. Defense counsel explained that they wanted to use Davis' statements to show "the overall changing of his story" and his increasing acknowledgment of culpability, culminating with his "Okay, I did it" statement, about stabbing Bear. Within this argument defense counsel conceded that the "Okay, I did it" statement was being offered "for the truth of the matter asserted."

¶ 34 The court then addressed this particular statement, suggesting that although there was evidence corroborating that Davis was present at the time of the murders, the court was not aware of corroboration for his statement that he had actually perpetrated one of the murders.[42] The court did not address or even mention Primeaux's "non-hearsay" argument. In fact, when the prosecutor later began to address Primeaux's argument that Davis' statements were not actually hearsay,[43] the trial court cut him off, saying, "Well, wait. I think to be clear, Mr. Bowen is saying he absolutely is offering the statement where Mr. Davis inculpates himself for the truth of the matter asserted, and that's really all that he is trying to get into the trial." Remarkably, and regrettably for Primeaux, defense counsel did not contest or correct this mischaracterization of his position, nor did defense counsel ever again directly raise the argument that most of the Davis statements that Primeaux wanted to introduce were not truly hearsay, since they were not being offered for the truth of the matter asserted.

¶ 35 The trial court concluded the hearing by presenting an extensive analysis of the § 2804(B)(3) evidentiary issue. The court found that because a reasonable man would not confess to a murder unless he believed this to be true, and because a reasonable man would understand that confessing to a murder was against his penal interest, Davis' statement that he had stabbed Bear was, indeed, against his penal interest. Yet the court further held that because the statement was being offered to exculpate Primeaux, it could not be admitted unless there was corroborative evidence clearly indicating its trustworthiness. The court concluded that it simply could not make this finding.[44]

¶ 36 On February 8, 2002, the second day of voir dire in Primeaux's trial, the State again raised the issue of statements made by Randy Davis, including statements made to persons other than Bohon and Thornton, and asked the trial court to "reaffirm its earlier ruling that Randy Davis' statements are not admissible in this trial."[45] The trial court

---

41. The State's current argument largely tracks that of the prosecutor during this hearing.

42. The court stated, "I am not sure that corroborative evidence that places him at the scene rises to the level of corroborative evidence that would indicate the trustworthiness of this confession." The fact that Davis and Primeaux were both charged under a felony murder theory, in addition to the malice-aforethought theory, was not discussed in this context.

43. The prosecutor noted that defense counsel had "relied to a great extent on the fact that they are not offering these things for the truth of the matter asserted."

44. The court summarized:

> Based on what I know of this case, the lack of forensic evidence, the fact that Mr. Davis does not provide any information in his statements that would not have been learned by him being merely present at the scene, his obvious error in recalling certain details, and, in some—and his change of position throughout the statement, ... certainly doesn't give any credibility to the trustworthiness of the final confession.

45. On January 30, 2002, the State had filed an additional motion in limine, seeking to prohibit any party or witness from making any comment or reference to "[a]ny statements made by Randy Davis to another person." Primeaux had previously filed various supplemental witness lists, noting that he intended to introduce the testimony of other persons to whom Davis had made incriminatory statements, and possibly even

then reviewed its prior ruling, noting that the issue had been dealt with solely under the exception to the hearsay rule for statements against penal interest.[46] Defense counsel argued that Primeaux should be allowed to present evidence about various actions that were taken as a result of Davis' statements, *e.g.*, the fact that Davis was arrested and charged with the murders of Bear and Littlecook. The trial court then clarified that its ruling addressed only the State's hearsay challenge, and noted that if statements made by Davis caused another person to take specific actions, those statements might be admissible, to show "the motivation of why someone acted as they did." [47]

¶ 37 An extensive discussion followed, in which the State argued that there was no "proper way" for the defense to get into the fact that Davis was arrested and charged based upon his inadmissible statements, and defense counsel argued vigorously that it had to be allowed to bring out this information, since Primeaux's "only defense is that Randy Davis was there and Randy Davis committed these crimes." The trial court concluded the discussion by again summarizing its limited evidentiary ruling:

> I do believe that the only ruling the Court has made was addressed to the out-of-court statements made by Randy Davis to the law enforcement officials. The

Court found that those were not admissible as an exception to the hearsay rule. I also don't know of any legal principle which would allow me, even if I was inclined to do so, to exclude the mention of Randy Davis or any involvement that he has in this case in—in toto. My understanding, as long as the evidence is relevant, and that's—that is the foundational consideration that the Court has to look at is, is the fact that Randy Davis was at one point arrested or charged or—is it relevant to this case; does it have any probative value. And I cannot say that it does not. I think that, certainly, the State will have an opportunity to rehabilitate witnesses and, if it's brought out that Randy Davis was arrested and charged, it can also be brought out that those charges were dropped because the District Attorney's office determined that the statements made were unreliable. I think these are facts that the jury is just going to have to wrestle with, but they are entitled to know that.

Hence the trial court recognized that Primeaux's jury should find out about the charges against Randy Davis and what happened in regard to those charges, and that the jury would simply "have to wrestle with" this evidence.

---

Davis himself. These statements included the following: (1) when Davis was being booked into the Kay County Jail, he was asked if he was under the influence of drugs or alcohol at the time of "the offense," and he responded, "I wasn't drunk, but I had a few."; (2) when Davis was asked, at this same time, whether he was "armed during the offense," he responded, "Yes, I had a knife."; (3) when Davis was then asked about this knife, he responded by demonstrating the size with his hands; and (4) when Troy Turner (another inmate at the Kay County Jail) asked Davis, "So, did you do it?", referring to the murder of Bear and Littlecook, Davis responded, "Well, Troy, you know how crazy I can get."

**46.** The trial court stated:

We did have extensive hearings on whether out-of-court statements by Mr. Davis were going to be admissible in this trial. And recognizing that they are hearsay, the exception that was offered to allow those statements to be admissible was statements against penal interests. And the Court looked at the statements

and, of course, under that particular exception to the hearsay rule, there are some tests that you apply—that essentially go to the trustworthiness of the statement. And the Court found that after viewing Mr. Davis'—the videotape of the statements that Mr. Davis gave to the police officers that due to his mental capacity and due to the inconsistencies that were given in those statements, due to the circumstances under which the statements were given, the Court had substantial question concerning the trustworthiness of those statements. I wasn't even convinced that Mr. Davis himself believed them when he said them. And for those reasons, I ruled that those statements would not be admissible.

Defense counsel did not challenge the court's summary in this regard or attempt to argue that any of Davis' statements should not be considered hearsay.

**47.** The court noted, however, that any reference to statements made by Davis should be taken up at the bench, before such statements were put before the jury, either as argument or testimony.

¶ 38 Regarding Davis' statements to other persons, however, the trial court indicated that it expected that these statements would be inadmissible for the same reason that Davis' other statements were inadmissible, *i.e.*, that the court found Davis himself to be unreliable, due to his personal problems and cognitive limitations.[48] The court concluded that any such statements should not be referenced or brought into the trial, unless they were first reviewed in an *in camera* hearing and the court concluded that the statements were admissible.

¶ 39 On February 11, 2002, the next day of Primeaux's trial, the State filed a motion seeking to preclude any evidence that Davis was ever charged as an accomplice with Primeaux.[49] The trial court overruled the motion, recognizing, once again, that "this is the type of thing that, unfortunately, the jury will have to sort out for itself."

¶ 40 Nevertheless, during the rest of the trial, the State continued to vigorously pursue its (new) theory that Primeaux acted entirely alone in killing Bear and Littlecook, and that Randy Davis had nothing whatsoever to do with the case or the crimes—beyond an initial and entirely mistaken decision to charge him along with Primeaux. In this regard, the State went too far, particularly in its elicitation of and reliance upon testimony from Lieutenant Bob Stieber.[50]

¶ 41 During cross-examination of Lieutenant Stieber, who was the lead investigator in the case, and over repeated objections by the State, defense counsel elicited the fact that Davis was interviewed four to five times in connection with the case, that he became a "suspect" in the case, that a knife was found in the search of his home, which was conducted pursuant to a search warrant (which Stieber was responsible for obtaining), and that after making statements to the police, Davis was arrested (without a warrant) based upon "the opinion of someone in law enforcement" that there was "probable cause to suspect Randy Davis was involved in these crimes."[51] On re-direct examination, Stieber testified that the charges filed against Randy Davis were eventually dismissed and that "as the chief investigator in the case," he "absolutely" agreed that this was "the right thing to do," based upon what he knew about the evidence at that time.[52]

¶ 42 During this same State questioning of Stieber, the following exchange occurred, which is the subject of Primeaux's Proposition IV claim on appeal:

Q. As you sit here today, Detective, do you know of any piece of physical evidence or statements made to third persons, whatsoever, that would tie Randy Davis to what happened to Warren and Julia?

48. The trial court also questioned whether Davis' statement to Troy Turner was truly "against penal interest," as that term has been defined legally. The court relied principally, however, upon its misgivings about Davis, based upon viewing the videotapes of Davis:

Secondly, the fundamental issue of Mr. Davis' ability to perceive and recall and relate the events of that day was called into question in the prior statements. That's what was the essence of the objection to the prior hearsay statements is that—that his—perhaps as a result of both lack of cognitive ability and abuse of alcohol, and whatever other emotional problems he may have, he was not reliable in the statements that he gave concerning that event. And after viewing the tapes for some hours, I concluded that that was true. I think that issue still remains, no matter who he is making statements to.

49. *See* 2/11/2002 Motion to Preclude the Introduction of Evidence that Randy Davis was Previously Charged as an Accomplice, O.R. 405–06. The State argued that because neither an arrest

nor the filing of an information can be considered as "evidence of guilt" in a criminal case, Primeaux should be precluded from demonstrating that Davis was ever arrested or charged.

50. The State's actions in this regard form the basis for Primeaux's Proposition IV.

51. Defense counsel failed to elicit the specific crimes for which Davis was actually arrested and charged, however, and failed to put the Information charging Davis into evidence. Since the jury did learn that other persons (various family members of Primeaux) had been arrested and charged in the case as accomplices "after-the-fact," this was potentially confusing to the jury.

52. At no point during Primeaux's trial was any reference made, before the jury, to the fact that the State may have been precluded from pursuing its case against Davis due, at least in part, to problems relating to his competency. Surprisingly, the record does not contain any evidence that defense counsel attempted to place evidence regarding this issue before Primeaux's jury.

R. Absolutely none.

Mr. Gibson: I have no further questions.

Defense counsel interposed no objection to this testimony—which arguably violated the trial court's hearsay ruling, since it asked Stieber to testify about the content of statements made by Randy Davis—and utterly failed to cross-examine or impeach Stieber upon this testimony, which went to the core of Primeaux's defense.[53] Nor did defense counsel ask the court to re-examine its prior ruling on the admissibility of Davis' statements, in order to use the statements to impeach Stieber.

¶ 43 The State, on the other hand, invoked Stieber's testimony that he was unaware of *any* physical evidence or statements made "whatsoever" tying Davis to the murders of Bear and Littlecook, in both its guilt-stage and punishment-stage closing arguments. During his first-stage closing argument, the prosecutor scoffed at Primeaux's defense that Davis alone killed Bear and Littlecook, noting that "according to the lead detective in this case, there is not one shred of physical evidence to tie him to this crime." During his second-stage closing argument, the prosecutor continued relying on Stieber's "no evidence" testimony:

They still want you to come back and figure out that solely because Bruce Primeaux told us this happened during his time in the bathroom that somehow Randy Davis is a real bad guy. And they even suggested to you that the evidence supports that; that same evidence being that Bob Stieber told you that charges were dismissed when it was determined there

was absolutely no physical evidence tying Randy Davis to the crime.

¶ 44 After Stieber's testimony was concluded, the State rested its case, and a final *in camera* hearing was held regarding what evidence Primeaux would be allowed to present.[54] Defense counsel stated that they planned to present the testimony of Primeaux, and that, if they were allowed to do so, they would also present the testimony of Officer Bohon, Agent Thornton, Troy Turner, Patrolman Don Round and Stephanie Burks,[55] and Red Davis[56] regarding, among other things, incriminatory statements that Randy Davis made to each of them.

¶ 45 The trial court responded by again invoking its reliability determination regarding any statements made by Davis. The court ruled that the proffered statements were hearsay, that the only argument being made for their admissibility was for statements against penal interest, and that the trial court simply could not make the necessary finding of reliability to admit these statements. The court concluded:

I clearly understand and everyone associated with this case understands that this case will stand or fall on appeal on this ruling. Either the Court of Criminal Appeals will agree with me or they will disagree with me and we'll get to do all of this again, but I have made it in good faith, that I don't believe that I can in good faith make the finding that is necessary to determine that that is an admissible statement against penal interest.

So any statement that is incriminating, that is quote, against penal interest, made

---

**53.** After making a feeble and unsuccessful attempt to bring out the fact that Red Davis told investigators that Randy Davis had a knife with him on the day of the murders—testimony that defense counsel conceded was inadmissible hearsay when the State objected to it—defense counsel simply sat down.

**54.** During this hearing the State took the position that the statements made by Davis at the time he was booked into jail were not admissible, since he had not been (re-)Mirandized and did not have counsel present at that time, in addition to arguing that they were unreliable for the same reasons that the court had found Davis' statements to Bohon and Thornton to be unreliable.

The State also argued that Bohon and Thornton should not be allowed to testify, because their testimony would only be cumulative to that of Stieber.

**55.** These were the officers to whom Davis made statements at the time he was booked into jail.

**56.** Primeaux proposed to present the testimony of Red Davis concerning a number of issues surrounding the knife found in his home—and Red's arrest and charge as an accessory to the two murders in the case—and the fact that the day after the murders, Randy Davis gave his father back the knife (a non-hearsay action) and stated that he had "done something" with it.

by Randy Davis, that is offered in these proceedings, will not be admitted.... [T]he Court is going to be consistent in its ruling with what it has previously ruled.[57]

The next morning defense counsel proffered the entirety of Officer Bohon's preliminary hearing testimony and made an offer of proof that if he were allowed to testify at trial, Bohon would testify "in conformity with" his earlier testimony.[58]

¶ 46 The preceding review of the record reveals that the trial court was earnestly striving to make the correct evidentiary rulings regarding evidence relating to Randy Davis and that the trial court fully appreciated the critical significance of this issue.[59] Nevertheless, the trial court totally failed to recognize or address Primeaux's argument that most, if not all, of the statements made by Davis to Officers Bohon and Thornton were *not* hearsay, since they were being offered for purposes other than the truth of the matter asserted therein. This defense argument was clearly presented in both a court filing and a pre-trial hearing. It was also recognized by the prosecutor, who attempted to respond to it at that same hearing, before the court cut him off. The trial court appeared to remain totally oblivious to this tenable and important argument, and never addressed it in any way.

¶ 47 Yet it would be unfair to place all of the blame on the trial court for this omission, since the court *repeatedly* stated that the only issue that it was considering was whether the § 2804(B)(3) "against penal interest" exception to the hearsay rule applied—and defense counsel never spoke up to remind the court about its broader "non-hearsay" argument or to challenge the court's narrowing of the evidentiary question at issue. Although defense counsel preserved the issue for purposes of this appeal—by twice making the non-hearsay argument to the trial court and proffering the entirety of Bohon's preliminary hearing testimony—defense counsel missed many opportunities to correct the trial court's failure to address Primeaux's broader evidentiary argument. Hence it is quite disinguous of appellate counsel to express surprise that the trial court failed to rule on this argument.[60]

¶ 48 Primeaux now asserts numerous non-hearsay purposes for which the statements Davis made to Bohon and Thornton should have been admitted at trial.[61] Defense counsel should have made these arguments at trial, where the record suggests they would have been thoughtfully and carefully considered by the trial court, and might ultimately have prevailed. Although the trial court erred in failing to recognize the "non-hearsay" argument that Primeaux did make, defense counsel's inaction regarding this failure raises a serious question of whether Primeaux was adequately represented at trial.[62]

**57.** Later that day the court again reviewed its ruling on the admissibility of statements made by Davis, this time also noting that the court was unaware of any evidence corroborating Davis' actual involvement in the crimes, rather than his mere presence at the scene.

**58.** Defense counsel also made an offer of proof that if Agent Thornton were allowed to testify, his testimony would mirror that of Bohon. Regarding the other witnesses to whom Davis made incriminatory statements, defense counsel relied upon his earlier proffers.

**59.** The careful attention of the trial court to this issue is not reflected in Primeaux's brief on appeal, nor is it reflected in today's Court's opinion.

**60.** Primeaux's appellate brief asserts that the trial court failed to rule on his "non-hearsay" argument, "[i]n spite of the universal understanding in the courtroom that the defense did not intend to offer the statements for the truth of the matter asserted, [and] did not claim the statements were true or trustworthy." This is quite misleading, though perhaps not as inaccurate as the assertion in Primeaux's reply brief, that he "never raised" a claim that Davis' statements "were admissible under an exception to the hearsay rule," which is simply false.

**61.** On appeal, Primeaux argues that these statements were admissible at trial as non-hearsay:

to show [Davis'] knowledge of the scene, why [Davis] had been arrested, that he repeatedly changed his story, to prove that he had been present at the scene, to corroborate Mr. Primeaux's story, to rebut the State's claim that no evidence implicating Randy Davis existed, and for the fact that the statements [were] made.

**62.** Yet Primeaux's twelve propositions on appeal do not include a single claim of ineffective assistance of counsel.

¶ 49 Nevertheless, and regardless of who is ultimately to blame, the trial court's refusal to allow any testimony about incriminatory statements made by Randy Davis violated Edward Primeaux's right to due process and rendered his trial fundamentally unfair. In *Chambers v. Mississippi*,[63] the Supreme Court recognized that "[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."[64] The *Chambers* Court addressed a factual situation closely paralleling the one now before this Court, and came to the conclusion that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice."[65]

¶ 50 The defendant in that case, Leon Chambers, was convicted of murdering a police officer, after the trial court refused to allow him to present evidence that shortly after the crime, another individual, Gable McDonald, confessed to three of his friends that he was the one who shot the police officer.[66] The jury did find out about a later confession by McDonald, some five months after the shooting. The jury learned that after meeting with a local minister, McDonald showed up at the offices of Chambers' attorneys and gave a sworn confession, which was transcribed, signed, and witnessed, that he was the one who shot the police officer and that he had used his own .22 caliber revolver, which he then discarded.[67] Upon cross-examination by the State, however, McDonald repudiated this confession, as he had done at his preliminary hearing.[68]

¶ 51 McDonald testified that he was not even present at the time of the shootings, since he was down the street at a café with a friend, and that he only confessed because the minister promised him that he would not go to jail and could share in the profits from a lawsuit that Chambers would bring against the city.[69] Even though one of McDonald's lifelong friends testified that he saw McDonald shoot the police officer; and a second witness, a cousin of the victim, testified that

---

63. 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

64. *Id.* at 294, 93 S.Ct. 1038. The *Chambers* Court likewise recognized that the "rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." *Id.*

65. *Id.* at 302, 93 S.Ct. 1038.

66. The *Chambers* case was about the shooting of Officer Aaron Liberty. Liberty and other officers were attempting to arrest a man at a bar, when a hostile crowd gathered and attempted to prevent the arrest. A riot broke out, and five or six shots were fired, from a .22 caliber revolver, four of which hit Liberty in the back. Before Liberty died, however, he turned around and fired his sawed-off shotgun into an alley area from which the shots appeared to have come. One of these shots hit Leon Chambers in the back of the head and neck, seemingly killing him.

The officers at the scene attended to Liberty, who died on the way to the hospital, but did not investigate whether Chambers was actually dead or had a weapon. When some of his friends (including McDonald) discovered that he was still alive, they took him to the hospital. Chambers was charged with Liberty's murder, but consistently maintained his innocence. *Id.* at 285–88, 93 S.Ct. 1038.

67. *Id.* at 287–88, 93 S.Ct. 1038. After this confession McDonald was turned over to local authorities, put in jail, and charged with shooting Officer Liberty. At his preliminary hearing one month later, however, McDonald repudiated this confession and testified that he was down the street in a café with a friend at the time of the shootings and that they only came to the scene afterwards. McDonald also claimed that he had lost his .22 caliber pistol months before the shooting. The local justice of the peace accepted this repudiation, refused to bind McDonald over for trial, and released him from custody. *Id.* at 288, 93 S.Ct. 1038.

68. Chambers called McDonald as a witness, after the State failed to call him, and requested that he be allowed to treat McDonald as an adverse witness, in order to cross-examine him fully. The trial court ruled that Mississippi's evidentiary code did not allow Chambers to treat McDonald as an "adverse witness." *Id.* at 291, 93 S.Ct. 1038. The Mississippi Supreme Court affirmed this ruling on appeal, since McDonald did not "point the finger at Chambers." *Id.* at 292, 93 S.Ct. 1038. In his petition to the Supreme Court, Chambers challenged this trial court ruling, along with its hearsay ruling, arguing that "the application of these evidentiary rules rendered his trial fundamentally unfair and deprived him of due process of law." *Id.* at 289–90, 93 S.Ct. 1038.

69. *Id.* at 291, 93 S.Ct. 1038.

he saw McDonald immediately after the shooting with a pistol in his hand; and the friend whom McDonald claimed to be with in a café at the time of the shootings testified that he was not with McDonald in any café that night,[70] Chambers was convicted.[71]

¶ 52 The trial court did not allow Chambers to present testimony from three individuals that McDonald confessed to them shortly after the crime,[72] finding that this testimony was inadmissible hearsay.[73] The evidentiary code of Mississippi, unlike current Oklahoma law, did not have an exception to the hearsay rule for statements that were against the declarant's "penal interest."[74] Hence Chambers could not even argue for an exception to the hearsay rule on this basis. Furthermore, Chambers did not attempt to argue that McDonald's out-of-court incriminatory statements were not hearsay.

¶ 53 Nevertheless, the Supreme Court ruled that the trial court's refusal to let Chambers present the testimony of the three witnesses to whom McDonald confessed, along with its refusal to let Chambers treat McDonald as an adverse witness, "denied him a trial in accord with traditional and fundamental standards of due process."[75] Although the Supreme Court did not find that the trial court erred in its hearsay ruling, or question the legitimacy of the hearsay rule,[76] the Court concluded that the *impact* of the trial court's narrow evidentiary rulings had been a denial of Chambers' broader constitutional right to present his defense and to a fair trial.[77] I would reach the same conclu-

70. *Id.* at 289, 292, 93 S.Ct. 1038. In addition, a gun dealer testified that McDonald purchased a .22 caliber revolver about a year before the murder and then purchased a different .22 three weeks after the murder. *Id.* at 293 n. 5, 93 S.Ct. 1038.

71. One officer at the scene testified that he saw Chambers shoot Liberty, and another officer testified that he saw Chambers "break his arm down" shortly before the shots were fired at Liberty. Three officers who saw Liberty shoot Chambers testified that they assumed Liberty was shooting his attacker. Yet a witness at the scene testified that he looked at Chambers when the shooting began, and he was sure that Chambers did not fire any shots; and the State was unable to present any evidence that Chambers ever owned a .22 caliber pistol. *Id.* at 286, 289, 93 S.Ct. 1038.

72. One of these witnesses would have testified that McDonald confessed to him that he had shot Liberty that same night, after they returned from the hospital. Another witness, the friend who testified that he was not in any café with McDonald, would have further testified that McDonald confessed to him that same night and later told him not to "mess him up." A third witness, a longtime friend and neighbor of McDonald's, would have testified that the morning after the shootings, McDonald told him that he had shot Liberty and then disposed of his .22 caliber revolver. He also would have testified that he was with McDonald when he purchased a new .22 caliber pistol, to replace the one he had discarded, several weeks later. *Id.* at 292–93, 93 S.Ct. 1038.

73. *Id.* at 292–93, 93 S.Ct. 1038. Although the basis of the trial court's exclusion of the third witness' testimony was not entirely clear, the Mississippi Supreme Court approved the trial court's exclusion of the proffered testimony from all three witnesses, finding that it was inadmissible hearsay. *Id.* at 293, 93 S.Ct. 1038.

74. As the *Chambers* Court noted, the Mississippi exception included only statements that were against the declarant's "pecuniary interest." *Id.* at 299, 93 S.Ct. 1038.

75. *Id.* at 302, 93 S.Ct. 1038.

76. In fact, the Supreme Court noted that the hearsay rule "has long been recognized and respected by virtually every State, [and] is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact." *Id.* at 298, 93 S.Ct. 1038.

77. The Court wrote:

In reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case, the rulings of the trial court deprived Chambers of a fair trial.
*Id.* at 302–03, 93 S.Ct. 1038.
This *Chambers* approach was subsequently applied to a capital case before the Supreme Court. *See Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979) (per curiam) (vacating death sentence where trial court excluded evidence, as hearsay, that co-defendant told someone that he alone killed victim, after ordering Green to run an errand). In *Green*, the Court again emphasized that narrow evidentiary rulings, even when correct, cannot be allowed to unfairly infringe upon a defendant's due process right to present his defense. *Id.* at 97, 99 S.Ct.

sion in the current case.[78]

¶ 54 Regardless of whether the trial court ruled correctly or incorrectly on the "against penal interest" exception to the hearsay rule,[79] the trial court's refusal to allow Primeaux to present evidence about Randy Davis' incriminatory statements to Officers Bohon and Thornton, and to demonstrate how the State had relied upon this same evidence, violated Primeaux's right to due process of law and rendered his trial fundamentally unfair. I find it preposterous that the State was allowed to hide this evidence from the jury, when agents of the State were the ones who originally developed and obtained the evidence, when the State then relied upon this evidence to arrest Davis and charge him with both murders, when the State presented this evidence at Davis' preliminary hearing, when the evidence was found to be adequately reliable and adequately corroborated by a magistrate judge (who bound Davis over on the original charges and added a rape count), and when the State did not dismiss its case against Davis until eleven months later (fifteen months after the case was first filed), after serious questions had arisen regarding Davis' competency to be tried.

¶ 55 I conclude that the trial court erred in failing to recognize the broader due process and fair trial issues that were at stake in its narrow evidentiary ruling on the admissibility of Davis' statements to third parties. The record indicates that the trial court permitted *substantial* argument on the admissibility of the Davis evidence and that the court addressed the issue repeatedly. The record also demonstrates that the trial court recognized the enormous *impact* of its ruling on

2150 ("Regardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause of the Fourteenth Amendment."). Within its assessment of the reliability of the excluded evidence, the Court emphasized that the State itself relied upon the disputed evidence, within its prosecution of the co-defendant. *Id.* ("Perhaps most important, the State considered the testimony sufficiently reliable to use it against Moore, and to base a sentence of death upon it.") (citing *Chambers*). This parallels the case at hand, in which the State earlier developed, presented, and relied upon the Davis evidence that it now calls "untrustworthy."

The holding in *Chambers* was also recently applied in a capital case before the United States Court of Appeals for the Tenth Circuit. *See Ellis v. Mullin*, 326 F.3d 1122, 1128–30 (10th Cir. 2002) (relying on *Chambers* to grant habeas relief based upon trial court's exclusion of evidence that defendant was diagnosed with paranoid schizophrenia, during pre-trial competency evaluation, which prevented defendant from fully presenting his insanity defense at trial).

78. Actually, the impact of the trial court's evidentiary ruling in Primeaux's case was arguably much more significant than the impact in the *Chambers* case. Although Leon Chambers' jurors did not hear about three of McDonald's confessions, they did hear about a separate, sworn confession that he made, along with substantial other evidence implicating McDonald, including eyewitness testimony. The jury was also able to evaluate McDonald's credibility and his repudiation of his confession directly, since he testified; and Chambers was able to impeach McDonald's "alibi" with direct testimony from his friend, who denied being in a café with him.

Primeaux, on the other hand, whose defense was that Randy Davis was responsible for both murders, was completely prevented from informing his jurors that Davis had confessed to one of the murders (and a rape) to investigating officers. The record in this case does not suggest that Davis ever formally renounced this confession; and Davis (unlike McDonald) was bound over for trial on the charges against him. Yet Primeaux's jury never learned what exactly Davis was arrested for and charged with, or how the State got him bound over for trial based upon the very same confession that it was now claiming was unreliable. And since Davis himself was "unavailable" at the time of trial, the jury was left to rely on the conclusion of the State's lead investigator in the case that there was essentially "no evidence" against him.

In *Chambers*, the Supreme Court acknowledged the significant evidence implicating McDonald that Chambers was allowed to present, but concluded that his defense "was far less persuasive than it might have been," if Chambers had been allowed to present the excluded confessions and fully cross-examine McDonald. *Id.* at 294, 93 S.Ct. 1038. I conclude that the impact of the trial court rulings in Primeaux's case was much more significant and detrimental.

79. The trial court was very clear that it was excluding any out-of-court statements made by Davis based upon its evaluation of Davis' reliability and the "trustworthiness" of his statements—a ruling that the court repeatedly stated was, in turn, based upon its evaluation of the *videotapes* of Davis' interviews with Bohon and Thornton. Since the record in this case does not contain any of these videotapes, this Court cannot actually evaluate the trial court's decision to exclude Davis' statements. We simply have not been provided with the necessary materials to do so.

Primeaux's defense and that its ruling on this issue could constitute reversible error. Yet the court failed to look beyond the framework of the narrow evidentiary question that it perceived, on the applicability of the § 2804(B)(3) exception to the hearsay rule—and failed even to recognize Primeaux's broader "non-hearsay" argument—to consider whether its ruling could be infringing upon Primeaux's fundamental constitutional right to call witnesses at trial and present his defense. I conclude that the trial court's "mechanistic" application of the hearsay rule in this case violated Primeaux's rights to due process and a fair trial.[80]

¶ 56 I further note that I am very disturbed by the State's elicitation of the "no evidence" testimony from Officer Stieber and its later invocation of this testimony during closing arguments. Stieber's testimony constitutes a very misleading, if not outright false, characterization of the evidence linking Davis to the murders of Bear and Littlecook.[81] Furthermore, given the context of the State's repeated attempts during trial to prevent the jury from hearing *anything* about the arrest and charging of Randy Davis (in addition to successfully preventing any testimony about his confessions), the State's elicitation and use of this Stieber testimony smacks of purposeful prosecutorial

misconduct, which was potentially prejudicial to Primeaux in both stages of his trial.[82]

¶ 57 Regarding defense counsel's representation, I recognize that this Court is empowered to decide only the claims that are actually raised before us on appeal. I note, however, that I am troubled by defense counsel's actions (and inaction) at trial regarding the much-disputed Davis evidence, particularly defense counsel's failure to react to Detective Stieber's testimony that there was "absolutely no[ ]" evidence "whatsoever" "that would tie Randy Davis to what happened to Warren and Julia," which went to the very heart of Primeaux's defense.[83]

¶ 58 Upon reviewing all of the evidence in this case, I recognize the possibility that a jury that has been properly instructed and given a complete picture of the evidence that the State had against Randy Davis—including the fact that the State found this evidence adequate to charge him with two counts of first-degree murder and that a judge found it adequate to bind him over on these charges (in addition to rape)—could nonetheless find Primeaux guilty of two counts of first-degree murder and sentence him to death, based upon the heinous nature of the killings, as well as Primeaux's criminal history.[84] Nevertheless, I cannot condone

---

**80.** *See Chambers*, 410 U.S. at 302, 93 S.Ct. 1038 ("[W]here constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.").

**81.** The current attempts by the State and this Court to defend Stieber's "no evidence" testimony are weak and disturbing. Although investigators did not find blood or fingerprint evidence from Davis at the crime scene, many aspects of Davis' description of the crime scene and how the murders occurred *were* corroborated by physical evidence at the crime scene. State witnesses at the preliminary hearing indicated that such corroboration was why Davis became a suspect and was eventually charged in the case. And the trial court itself recognized that there was substantial evidence corroborating Davis' presence at the time of the murders. In addition, the knife found in Davis' home, where he indicated it would be found, was also arguably corroborative physical evidence. Even though the State apparently came to the conclusion, by the time of Primeaux's trial, that this knife was not the murder weapon, the evidence presented at trial did not exclude the possibility that Davis' knife was used in the double homicide, as he had indicated.

**82.** We need not decide whether this prosecutorial misconduct alone necessitates reversal in this case, since Primeaux presents a cumulative error claim, in addition to his individual claims. My dissent is based upon the cumulative effect of the numerous errors in Primeaux's trial.

**83.** The trial court had earlier made clear the limited nature of its ruling regarding the Davis evidence, and noted that the exclusion of this evidence was subject to change and review, depending on what happened as the trial progressed. It strikes me as obvious that when the lead investigator in the State's case testifies that he is aware of absolutely no statements to third parties tying Davis to the murders of Bear and Littlecook, that the State has forcefully and blatantly kicked opened the door to impeachment evidence about the content of incriminatory statements made by Davis. Why didn't defense counsel feel the breeze?

**84.** As I hope is clear, however, I also find that there is a reasonable probability of a different result for Primeaux, particularly regarding at least one of his sentences.

this Court's decision to send a man to his death based upon our after-the-fact conclusions about what a jury would most likely have done, if only the defendant's trial had been properly conducted. For the reasons discussed above, I would reverse and remand for a new trial.